**CATELLUS DEVELOPMENT CORPORATION, Plaintiff,**

v.

**UNITED STATES of America; General Automotive, Inc., a Washington corporation; NL Industries, Inc., a New Jersey corporation; Morris P. Kirk, Jr., an individual; Andrew C. Merryman, III, an individual, Defendants.**

No. C–91–2531 EFL.

United States District Court, N.D. California.

Aug. 3, 1993.

---

Kurt Flehinger, Landels, Ripley & Diamond, San Francisco, CA, for plaintiff.

Marilyn Perry Jacobsen, U.S. Dept. of Justice, Land & Natural Resources Environmental Defense Section, Washington, DC; Earl Hagstrom, Sedgwick, Detert, Moran & Arnold; Dirk M. Schenkkan, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, CA; James H. Schink, Kirkland & Ellis, Chicago, IL; and Jerome A. Busch, Busch & Taylor, Irvine, CA, for defendants.

### *ORDER GRANTING SUMMARY JUDGMENT*

LYNCH, District Judge.

Plaintiff Catellus Development Corporation ("Catellus") brought this suit pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as Amended, 42 U.S.C. § 9601 et seq., ("CERCLA"), 42 U.S.C. §§ 9607(a)(2) and (3). Plaintiff seeks to recover response costs which it claims to have incurred in the investigation and remediation of its contaminated Point Isabel property in Richmond, California.

This matter is before the Court on a motion for summary judgment by one defen-

dant, General Automotive, Inc. ("General"), and a cross-motion against General by plaintiff Catellus. For the reasons set forth below, the Court will grant General's motion for summary judgment and deny the cross-motion by Catellus.

## I. *Factual Background*

The material facts pertinent to this motion are, by plaintiff's own admission, undisputed. Catellus owns a parcel of property at Point Isabel in Richmond, California, which was contaminated by lead that leached into the soil and surrounding bay from crushed battery casings dumped at the property over the course of several years. In the mid–1980's environmental regulators discovered elevated levels of lead in the soil and in the shellfish in the bay adjacent to the property and ordered Catellus to investigate and ultimately clean up the contamination. Catellus incurred response costs in excess of $6 million in the effort.

A substantial portion of the crushed battery casings which contaminated the property were transported to Point Isabel from a battery cracking plant operated by Morris P. Kirk & Sons, Inc. ("MPK"), a division of defendant NL Industries in Emeryville, California. The MPK plant reclaimed lead from dead lead acid batteries, the majority of which were from automobiles. MPK obtained dead batteries from gasoline service stations, United States military bases, and auto parts facilities throughout Northern California, such as the Grand Auto Parts Stores operated by General.

Defendant General, through its Grand Auto Parts Stores, sold dead automobile batteries to MPK. The batteries MPK purchased were depleted and no longer useful for their customary purpose of providing electrical power to automobiles. MPK purchased the batteries solely for the lead contained within them, and the prices MPK paid fluctuated directly with the price of lead.

The batteries MPK purchased required considerable processing before the lead contained within them could be reused. First, MPK would melt or guillotine the top off a battery in order to remove the lead plates from within it. MPK would then ship the lead innards to its facility in Los Angeles, California for smelting. The lead was smelted for a wide variety of new uses, which included the manufacture of lead solder, lead babbitts, sheet lead, lead pipe, lead shot, plumbers caulking lead, lead for printing type machines, and ingot lead for battery manufacturers.

After MPK removed the lead from batteries, the battery casings would be washed, crushed, loaded into a truck, and finally dumped. Tons of pieces of crushed battery casings were found at Point Isabel. Tests of those pieces of battery casings revealed that they were affected with lead which caused the contamination at plaintiff's Point Isabel property.

It is significant for purposes of the Court's analysis that upon purchase of batteries by MPK, MPK assumed full and complete ownership and control of the batteries. General, upon sale of the batteries to MPK, relinquished all ownership interest in and control over the batteries. General was not directly involved in the transportation, processing, recycling, or disposal activity conducted by MPK.

## II. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when the moving party shows that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir.1985).

The central purpose of summary judgment is "to pierce the pleading and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact actually exists. *Id.* at 585–586, 106 S.Ct. at 1355–1356. The opposing party must then "go beyond the plead-

ings and by her own affidavits or by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The opposing party may not simply rest on its pleadings. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983).

Furthermore, the opposing party must demonstrate that the fact in contention is material, that is, that "the evidence is such that a reasonable jury could return a verdict for the opposing party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Rule 56(e), Fed. R.Civ.P. The opposing party must demonstrate that a material fact is in contention for each of the essential elements required to support its case. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all of their facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. Summary judgment must be entered unless the opposing party can produce specific facts showing the existence of a genuine issue of material fact for trial. *Steckl*, 703 F.2d at 393.

### III. *Analysis*

CERCLA provides a private right of action for a private party, like plaintiff Catellus, to recover necessary response costs it incurs pursuant to a national contingency plan. Among those persons who may be liable to another party for necessary cleanup costs, CERCLA includes *inter alia* "any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances...." 42 U.S.C. § 9607(a)(3).

■ The parties' cross-motions for summary judgment present a discrete issue. Was General's sale of used batteries to MPK an arrangement for disposal or treatment of hazardous substances within the meaning of 42 U.S.C. § 9607(a)(3)? The Court thinks not.[1]

### A. *"Arrangement for Disposal"*

■ Plaintiff argues that a sale of used batteries containing hazardous material (lead), no longer useable for their customary purpose of providing electricity for vehicles, is for all practical purposes an "arrangement for disposal" and ought to give rise to liability under CERCLA. Defendant General contends that the sale of used batteries on a viable market, when such sale results in a complete transfer of ownership from seller to buyer and the seller's relinquishment of any control over the batteries, is not and should not be construed as an "arrangement for disposal" for purposes of creating CERCLA liability.

The issue before this Court is not one which has been squarely addressed by the Ninth Circuit, nor, to the best of our knowledge, by any other circuit court in a parallel factual context. However, two Ninth Circuit decisions—*Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 959 F.2d 126 (1992), and *3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355 (1990)—provide this Court with some guidance, and the Court will look to those decisions to the extent they shed light on the motion before it.

Although the Court is hard pressed to find a circuit court decision squarely addressing the issue the Court faces here, in the many published decisions in which courts have been forced to grapple with § 9607(a)(3), they have often done so in contexts where the government or a private party seeks to impose CERCLA liability on the seller of some product which consisted of or contained a hazardous substance. *See, e.g., Florida*

---

**1.** Although it lacks standing with respect to General's motion for summary judgment, the United States has filed a brief arguing, in reliance upon *Santa Fe Pacific Realty Corp. v. U.S.*, 780 F.Supp. 687 (E.D.Cal.1991), that the question of whether General arranged for disposal under § 9607(a)(3) is necessarily a question of fact. This Court, in reliance upon the Ninth Circuit's decision in *Jones–Hamilton*, disagrees. *Jones–Hamilton v. Beazer Materials & Services*, 959 F.2d 126, 131 (1992) (finding an arrangement for disposal on a motion for summary judgment).

*Power & Light v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990); *Chesapeake and Potomac Telephone Company of Virginia v. Peck Iron & Metal Co., Inc.*, 814 F.Supp. 1269 (E.D.Va.); *U.S. v. Pesses*, 794 F.Supp. 151 (W.D.Pa.1992); *U.S. v. Ward*, 618 F.Supp. 884 (E.D.N.C.1985); *State of New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y.1984); *U.S. v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill.1984). In such cases, where sellers have sought to characterize their transactions as "sales" rather than CERCLA disposals or disposal arrangements, the courts have not hesitated to look beyond the seller's characterization to determine whether a transaction in fact involved an arrangement for disposal of a hazardous substance under CERCLA. *U.S. v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1987); *see also Jones–Hamilton*, 959 F.2d at 131 (Ninth Circuit citing *Aceto's* analysis with approval). It appears clear, based on these transactional cases, that at least some products are by their very nature outside the ambit of a legitimate "sale," and that any purported "sales" involving such products are necessarily within CERCLA's coverage of "arrangements for disposal." *See, e.g., Ward*, 618 F.Supp. at 895.

The initial question for this Court is where to draw the line between sales of pure waste product, which by definition fall within CERCLA's reach, and other transactions which may or may not subject a seller to CERCLA liability depending upon additional considerations. Plaintiff would have the Court draw this line between those items which remain useful for the purpose intended by their original manufacturers, and those which have only some salvage or collateral utility. Thus, the sale of dead auto batteries, no longer capable of fulfilling their customary usage of providing electricity for vehicles, would necessarily constitute a "disposal" or "arrangement for disposal" placing the sellers of such batteries within the reach of CERCLA.

While plaintiff's proposed dichotomy finds some support in the case law, the Ninth Circuit in a related context has adopted a more sensible, less formalistic test which fo-

cuses instead on whether a product has a "productive use." *See Stevens Creek*, 915 F.2d at 1361–1362. In *Stevens Creek*, the Ninth Circuit addressed the question of whether the builder of a commercial office building containing asbestos fireproofing materials could incur CERCLA liability for the costs of subsequent removal of asbestos pursuant to § 9607(a)(2). That section imputes CERCLA liability to a "person who at the time of *disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were *disposed* of." 42 U.S.C. § 9607(a)(2) (emphasis added). The court gave meaning to the term "disposal" by referring to the decisions of courts outside the Ninth Circuit in the context of § 9607(a)(3). It observed that other courts had construed "disposal" as "referring only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Stevens Creek*, 915 F.2d at 1362. And the court determined that there was no reason to treat § 9607(a)(2) and § 9607(a)(3) any differently with respect to their definitions of "disposal." *Id.* at 1362. Thus, the court concluded that the defendant (through its predecessor in interest) had not disposed of asbestos in constructing a building that contained that hazardous substance. *Id.*

There is no intimation in the Ninth Circuit's *Stevens Creek* decision that the courts should draw an artificial distinction between products which remain useful for the purpose for which they were originally manufactured, and those which remain useful only for some collateral use. Indeed, the *Stevens Creek* court pointed out that the terms "solid waste" and "hazardous waste," which are incorporated in CERCLA's definition of "disposal," "do not include materials which are 'used or *reused* as ingredients in an industrial process to make a product....'" *Id.* at 1361 (quoting 40 C.F.R. § 261.2(3)(1)(i)) (emphasis added). Thus, *Stevens Creek* clearly suggests that the dichotomy plaintiff proposes in this case, which has gained some acceptance in other courts, has not been and will not be adopted as the law of the Ninth

Circuit.[2]

It is undisputed in this case that the dead batteries sold by General, though no longer useable for the purpose intended by their original manufactures (providing electrical current for automobiles), were still of value at the time of sale because of the lead they contained.[3] A viable market existed for these batteries which lead reclaimers like MPK could process to obtain lead for use in the manufacture of a wide variety of useful products: lead solder, lead babbitts, sheet lead, lead pipe, lead shot, plumbers caulking lead, etc. Thus, the sale of batteries by General in this case did not involve the sale of products which, by their very nature, would subject their seller to CERCLA liability under § 9607(a)(3).

The Court's inquiry, however, is not at its end. In CERCLA cases involving the purported "sale" of a product which consists of or contains a hazardous substance, the courts also examine other aspects of the transaction apart from the nature of the product sold. While the courts are not in complete agreement over all the factors which should be considered, the basic test which seems to have gained wider acceptance among the federal courts than any other formulation was announced by Chief Judge Foreman in *U.S. v. A & F Materials Co., Inc.*, 582 F.Supp. 842 (S.D.Ill.1984), one of the earliest CERCLA

decisions addressing § 9607(a)(3). There the district court held that under § 9607(a)(3), "the relevant inquiry is *who decided* to place the waste into the hands of a particular facility that contains hazardous wastes." *Id.* at 845 (emphasis in original). The same test was applied in *Chesapeake* and *Pesses,* the decisions relied upon most heavily by plaintiff in this case. *See Chesapeake,* 814 F.Supp. at 1275–76; *Pesses,* 794 F.Supp. at 156.[4]

In *Jones–Hamilton,* the only Ninth Circuit decision which thus far has directly addressed the issue of when § 9607(a)(3) arranger liability should attach, the court failed to enunciate a general test for liability. Rather, the court simply determined in a fact-specific manner that in the case before it the defendant was amenable to CERCLA liability. The *Jones–Hamilton* case was unlike the case at bar in many respects. It did not involve the sale of a product containing hazardous substances, but a chemical formulation agreement between a manufacturer and a contract chemical formulator whereby the latter agreed to formulate raw materials provided by the manufacturer into wood preservation compounds. *Jones–Hamilton,* 959 F.2d at 127–128. The defendant manufacturer actually retained ownership of the materials it provided to the formulator, and the agreement between the two expressly con-

2. While plaintiff's proposed dichotomy purports to cut a broader swath in favor of CERCLA's environmental concerns, it also takes a dramatic step in the direction of undermining the tremendous strides our nation has taken toward recycling hazardous products for productive ends. Our society has entered an era of recycling in which the reuse of spent products is celebrated, not condemned. The dichotomy proposed by plaintiff penalizes recyclers on a categorical basis by treating them less favorably than original manufacturers of hazardous substances who put additional hazardous materials into the stream of commerce—a result seemingly inconsistent with the environmental concerns the authors of CERCLA's remedial scheme intended to protect.

3. Although counsel for neither party was able at oral argument to specify a price range for the dead batteries on the secondary market, it was undisputed that a viable market existed for the batteries and that the price of batteries generally fluctuated with the price of lead. Defendant contends, and plaintiff does not dispute, that the resale of dead batteries purchased from individu-

al consumers has been and remains a profitable component of its business.

4. Judge Foreman's test has been criticized on the grounds that it creates an inequitable dichotomy between parties who exercise enough care to choose a disposal site (and thereby incur liability), and those who close their eyes to the path of the hazardous materials they dispossess themselves of (and thereby avoid liability). *See* Alice T. Valder, *Note: The Erroneous Site Selection Requirement For Arranger and Transporter Liability Under CERCLA,* 91 Colum.L.Rev. 2074, 2084–2085 (1991); *Violet v. Picillo,* 648 F.Supp. 1283, 1290 (D.N.C.1985). The fact-specific analysis utilized by the Ninth Circuit in *Jones–Hamilton,* discussed *infra,* would certainly argue against the hypertechnical application of any liability test which might give rise to such a dichotomy; and this Court, through its decision today, in no way means to suggest that a party may escape CERCLA liability through its willful or otherwise inexcusable ignorance of the consequences of its sale of hazardous materials.

templated the spillage of hazardous materials onto the property of the plaintiff. *Id.* at 131. Based on these facts and the Eighth Circuit's holding in a parallel fact context in *Aceto,* 872 F.2d 1373 (1989), it was clear to the court that the defendant had "arranged for disposal" of hazardous substances on plaintiff's property.

Although the *Jones–Hamilton* case is readily distinguishable from the case at bar, it is instructive with regard to the factors which ought to inform a court's decision whether to find a seller within the reach of § 9607(a)(3). There the Ninth Circuit looked to factors which other courts have relied upon in assessing arranger liability. The *Jones–Hamilton* court examined whether the defendant, in transferring possession of the hazardous substances, retained an ownership interest in those substances. *See Jones–Hamilton,* 959 F.2d at 131; *see also Pesses,* 794 F.Supp. at 156 (CERCLA liability may be found where a defendant retains ownership of its substances and thereby has authority to control the way its substances are treated or disposed of); *Aceto,* 872 F.2d at 1383 (same). The court also found it significant that the parties expressly contemplated (implicitly, the defendant had knowledge) that some hazardous materials would be spilled on plaintiff's property. *See Jones–Hamilton,* 959 F.2d at 131; *see also Pesses,* 794 F.Supp. at 156 (CERCLA liability may be found where a defendant sells its hazardous substances to a facility with knowledge that the substances will be disposed of there); *General Electric,* 592 F.Supp. at 297 (same). These factors are germane to the central inquiry as to who made the crucial decision to put the hazardous materials in the hands of the contaminated CERCLA facility. *See Pesses,* 794 F.Supp. at 156.

In the instant case it is undisputed that defendant General, once it transferred possession of the dead batteries to MPK, was divested of any right or ability to control the batteries, their treatment, or their ultimate disposal. Defendant's ownership interest in the batteries ended unequivocally at the moment of sale to MPK. And plaintiff has neither alleged, nor produced evidence, indicating that General knew that any hazardous material would be disposed of on plaintiff's Point Isabel property. Indeed, unlike most § 9607(a)(3) cases, this case involves an attempt to recover against a defendant for the clean-up of a facility it had no direct connection with. General's only connection with the ultimate disposal of lead tainted battery casings at plaintiff's Point Isabel property was its sale of dead batteries to MPK who, independent of General's control or influence, reclaimed the lead from those batteries before having the remaining battery casings hauled to Point Isabel for disposal. Unlike in *Jones–Hamilton,* here every relevant consideration suggests that the defendant did not make the crucial decision to place the hazardous materials into the contaminated facility. Thus, the Court finds as a matter of law that defendant General did not, within the meaning of § 9607(a)(3), arrange for the disposal of hazardous materials at plaintiff's Point Isabel property.[5]

Plaintiff has relied heavily upon *Chesapeake* and *Pesses,* two recent district court opinions involving battery reclaimers, which it argues support a contrary result. These cases are readily distinguishable on their facts. *Chesapeake* involved a CERCLA action brought to recover costs incurred in the clean-up of a battery reclaimer's own property. Defendants were battery recyclers who sold dead batteries directly to a party which disposed of hazardous materials on its own property. *See Chesapeake,* 814 F.Supp. at 1271–1276. Likewise in *Pesses* the defendants were recyclers who sold industrial scrap materials, including spent nickel cadmium batteries, to a reclaimer who processed the materials and disposed of the remaining hazardous substances on his own property.

---

**5.** This is clearly not a case in which the plaintiff has not had an adequate opportunity to develop the facts of this case to demonstrate the existence of a genuine issue of material fact precluding summary judgment. Indeed, this motion was argued within weeks of the Court's original trial date and following opportunity for complete discovery by both sides. Yet, plaintiff can direct the Court to no evidence, in the form of deposition testimony, affidavit, or otherwise, which indicates that General retained any ownership interest in the batteries, controlled their handling and treatment by MPK, or knew of how or where the battery casings would ultimately be disposed.

Both the *Chesapeake* and the *Pesses* courts found liability under § 9607(a)(3). Presumably in those cases, where the defendants put their hazardous substances directly into the hands of a party who disposed of hazardous substances on his own site, the defendants knew or had good reason to know of the disposal of hazardous substances at the CERCLA facility. *See Jones–Hamilton,* 959 F.2d at 131 (suggesting that defendant's knowledge is a factor); *see also Pesses,* 794 F.Supp. at 156 (CERCLA liability may be found where a defendant sells its hazardous substances to a facility with knowledge that the substances will be disposed of there); *General Electric,* 592 F.Supp. at 297 (same).

*Chesapeake* and *Pesses* stand in stark contrast to this case, where defendant General sold batteries to MPK who recovered the lead from the batteries before MPK, not defendant General, had the leftover battery casings delivered to Catellus for disposal at the Point Isabel property.[6] Unlike in *Chesapeake* and *Pesses,* in this case there is no direct connection between the defendant and the CERCLA facility.[7] Although the Court has no quarrel with the results reached in *Chesapeake* and *Pesses,* to the extent that the reasoning in those cases is in conflict with that contained herein, this Court respectfully disagrees with those decisions.

At oral argument on this motion, plaintiff placed much reliance upon three additional district court opinions addressing § 9607(a)(3) outside the battery recycler context: *U.S. v. A & F Materials Co.,* 582 F.Supp. 842 (S.D.Ill.1984); *State of New York v. General Electric Co.,* 592 F.Supp. 291 (N.D.N.Y.1984); *U.S. v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985). In addition, several weeks after this matter had been taken under submission, plaintiff filed with the Court a "Notice of New Decisional Law," to which it attached a recent opinion by Judge Weigel of this Court in *State of California v. Sum-*

*mer del Caribe, Inc.,* 821 F.Supp. 574 (1993). We address each of these decisions in turn.

In *A & F Materials,* discussed *supra,* the district court denied a defense motion for summary judgment in a case where the government sought to impose CERCLA liability upon a large aircraft manufacturer which had sold a caustic solution for $.07 per gallon to a company which used the solution in an oil reclamation process before disposing of it on its own site. *A & F Materials,* 582 F.Supp. at 843–845. In *Summer del Caribe,* Judge Weigel, upon reconsideration of a previous summary judgment motion, granted plaintiff's motion for summary judgment in a case similar to *A & F Materials.* The *Summer del Caribe* decision involved a defendant can manufacturer which sold solder dross, a by-product of its can manufacturing process, to a metal reclamation company which melted the solder dross, reclaimed the reusable portion of it, and disposed of the remaining hazardous materials on its own site. Judge Weigel found under these facts that the defendant can manufacturer had "arranged for disposal" under CERCLA. *Summer del Caribe,* 821 F.Supp. at 581–582. Apart from the fact that no batteries were involved, these cases parallel *Chesapeake* and *Pesses.* Like those cases, *A & F Materials* and *Summer del Caribe* involved potential liability for disposal of hazardous substances on a buyer's property, not the property of some third party. This is unlike the instant case where plaintiff seeks to impose liability on a party which lacks any direct connection with the CERCLA facility without any evidence that the defendant knew that the hazardous materials would be disposed of at that facility. Unlike in the *A & F Materials* and *Summer del Caribe* cases, here the buyer of the product containing hazardous materials is not the owner of the CERCLA facility at issue in the suit.

---

6. Moreover, the extension of CERCLA liability in this context, where the defendant's connection with the CERCLA facility is substantially attenuated, would undoubtedly discourage the recycling of products containing hazardous substances.

7. Plaintiff does allege in this case that MPK, for some time, disposed of hazardous battery acid

directly on its own site. However, MPK's site is not the CERCLA facility at issue in this litigation; therefore, the spillage of battery acid there has nothing to do with the motion before the Court. The Court, however, in no way suggests that defendant General could not face CERCLA liability for the clean-up of MPK's contaminated property.

In *State of New York v. General Electric Co.,* the government sought to impose CERCLA liability upon a large manufacturer which had sold several hundred drums of spent, PCB laden transformer oil to a racing dragstrip which sprayed the oil on its grounds for purposes of dust control. *State of New York v. General Electric Co.,* 592 F.Supp. at 293. The complaint contained allegations that the defendant knew of the dragstrip's intended use for the oil. *Id.* at 297. The district court declined to grant the defendant's motion to dismiss. The *General Electric* case is unlike the one before this Court in that it involved a defendant with a direct connection with the CERCLA facility and alleged knowledge of how the hazardous materials would be disposed of by the buyer.

The *Ward* case, upon which plaintiff relies, is among the most egregious instances of CERCLA "sham sales" memorialized in a published opinion to date. The *Ward* court granted the government's motion for partial summary judgment finding liability under § 9607(a)(3) in a case where the purported buyer of the defendant's PCB laden transformer fluid paid defendant $.70 per gallon for the contaminated fluid in repayment of a previous debt. Not only did the defendant have direct knowledge of the purported buyer's method of disposal (spraying the fluid along the sides of North Carolina roadways), but the parties' agreement originally contemplated that the defendant would pay the purported buyer $1.70 per gallon for disposal of the contaminated fluid. The *Ward* case does little to advance the plaintiff's arguments in this case.

None of the decisions reached in these four cases urge a finding of § 9607(a)(3) liability in the instant case; and, to the extent that the reasoning set forth in the *A & F Materials, Summer del Caribe, General Electric,* and *Ward* opinions may be inconsistent with that contained herein, this Court respectfully disagrees with those decisions.

### B. *"Arrangement for Treatment"*

Plaintiff also contends that General's sale of dead batteries to MPK constituted an "arrangement for treatment" within the meaning of § 9607(a)(3). Although General has failed in its opposition papers to address this issue, plaintiff's contention is easily dismissed.

First, although the term "treatment" is defined separately from the term "disposal" in CERCLA, *see* 42 U.S.C. § 9601(29) (incorporating definitions from § 1004 of the Solid Waste Disposal Act), it does not appear that the courts have analyzed the terms separately in applying § 9607(a)(3). *See, e.g., Jones–Hamilton,* 959 F.2d at 130–131; *Aceto,* 872 F.2d at 1378–1382; *Pesses,* 794 F.Supp. at 155–157. If this indeed is the approach the Ninth Circuit implicitly adopted in *Jones–Hamilton,* this Court adopts its "disposal" analysis from above. While the Court questions the wisdom of such an approach in light of the separate and dissimilar definitions Congress has provided for "disposal" and "treatment," the Ninth Circuit's *Jones–Hamilton* case and the Eighth Circuit's decision in *Aceto,* upon which *Jones–Hamilton* heavily relied, were cases which cried out for separate analysis under the "treatment" prong of § 9607(a)(3); yet those courts focused singularly on whether an "arrangement for disposal" had been shown.[8]

Second, the Court has before it evidence of a series of uncomplicated sales by General to MPK, but absolutely no evidence that the parties contracted for "treatment" of the batteries sold. More precisely, there is no evidence that General's sales transactions with MPK encompassed any conditions regarding the handling, processing, or treat-

---

**8.** *Jones–Hamilton,* discussed *supra,* involved a chemical formulation agreement between a manufacturer and a contract chemical formulator, pursuant to which the manufacturer supplied raw materials for formulation by the latter into wood preservation compounds. *Jones–Hamilton,* 959 F.2d at 127–128. The manufacturer retained an ownership interest in the materials during the formulation process. *Id.* at 128. *Aceto* involved chemical formulation agreements be-

tween eight pesticide manufacturers and a contract chemical formulator. *Aceto,* 872 F.2d at 1375. Pursuant to their agreements, the chemical formulator would mix the manufacturers' materials with inert materials according to the manufacturers' specifications, then ship the resulting commercial grade product back to the manufacturer or directly to the manufacturer's customers. *Id.*

ment of the batteries sold. The sales were simply sales by which MPK acquired what General dispossessed itself of, not contracts for treatment of the items transferred. The plain language of § 9607(a)(3) subjects a person who "arranged for treatment" of a hazardous substance to potential CERCLA liability. While courts for good reason look behind transactions which purport to be "sales" of products to ascertain whether they should be treated as arrangements for disposal under CERCLA, there is no basis for subjecting "sales" to similar scrutiny under the "treatment" prong of § 9607(a)(3). "Treatment," as defined by CERCLA, necessarily involves more than a mere transfer of possession and connotes some process designed to alter the character or composition of a product.[9] In this sense a "treatment" is unlike a "disposal," which can easily be cloaked as a "sale" by simply providing for an exchange of money at the time of exchanging goods. In the absence of some evidence which indicates the seller of a product containing hazardous substances actually exercised some control over the "treatment" which the product eventually received in the hands of the buyer, there is simply no valid basis for imputing liability to the seller.

In the instant case there is absolutely no evidence that General exercised any control over the alleged "treatment" of dead batteries in the hands of MPK. There is no evidence of contract conditions regarding "treatment" that became a part of the battery sales transactions, no evidence that General retained any ownership interest in the batteries it sold, and no evidence that General otherwise exercised any influence over MPK's "treatment" of the batteries. Accordingly, the Court finds as a matter of law that General's sale of dead batteries to MPK did not constitute an "arrangement for treatment" within the meaning of § 9607(a)(3).

### IV. Conclusion

No genuine issue of material fact precludes the issuance of summary judgment in this case. For the reasons set forth above, defendant General's motion for summary judgment is GRANTED and plaintiff Catellus' cross-motion for summary judgment is DENIED.

IT IS SO ORDERED.

---

**9.** CERCLA defines "treatment" as follows: "The term 'treatment', when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume." 42 U.S.C. § 6903(34) (incorporated at 42 U.S.C. § 9601(29)).