CATELLUS DEVELOPMENT CORPORATION, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Amicus,

General Automotive, Inc., a Washington corporation, Defendant–Appellee.

No. 93–16530.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 1994.

Decided Aug. 10, 1994.

Earl L. Hagström, Sedgwick, Detert, Moran & Arnold, San Francisco, CA, for defendant-appellee.

Susan S. Fiering, Deputy Atty. Gen., Oakland, CA, for amicus curiae.

David C. Shilton, Washington, DC, for amicus curiae U.S.

Before: WALLACE, Chief Judge, CHOY, Circuit Judge, and McGOVERN,* District Judge.

Opinion by Chief Judge WALLACE.

WALLACE, Chief Judge:

On this appeal, we consider whether a party that sells spent automotive batteries to a lead reclamation plant may be liable under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, for the costs of cleaning up the property where lead-containing remnants of the batteries are eventually dumped. Catellus Development Corp. (Catellus) appeals from the district court's summary judgment which held that General Automotive (General) could not be made to contribute to the clean-up costs of Catellus's property under the theory that it "arranged for disposal or treatment" of a hazardous substance. The district court had jurisdiction under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to under 28 U.S.C. § 1291. We reverse and remand.

I

General operates Grand Auto Parts Stores which receive used automotive batteries from customers as trade-ins. General's policy in disposing of these batteries had been to drive a screwdriver through the spent batteries and then sell them to a battery cracking plant operated by Morris P. Kirk & Sons, Inc. (Kirk) which extracted and smelted the

---

Sanford Svetcov, Landels, Ripley & Diamond, San Francisco, CA, for plaintiff-appellant.

* Honorable Walter T. McGovern, United States District Judge, Western District of Washington, sitting by designation.

lead. Kirk assumed full and complete ownership and control of the batteries.

After lead was extracted from the batteries, the left-over battery casings had to be disposed of. It was Kirk's practice to wash and crush the battery casings, load them into a truck, and then dump them. Tons of pieces of crushed battery casings were found at Catellus's property, a substantial number of which were transported from Kirk's plant. The battery casings contained lead which contaminated the property.

Catellus alleges that among the battery casings found on its property were battery casings originating from the batteries sold by General to Kirk. Catellus now seeks to recover response costs from General under CERCLA. Catellus argues that General is liable for response costs as a party who "arranged for disposal or treatment" of a hazardous substance under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

On cross-motions for summary judgment, the district court held that, as a matter of law, the facts alleged by Catellus did not constitute an arrangement for disposal or treatment by General. *Catellus Development Corp. v. United States*, 828 F.Supp. 764 (N.D.Cal.1993). We review de novo the district court's summary judgment. *Briggs v. Sullivan*, 954 F.2d 534, 537 (9th Cir.1992). The sole question before us is whether, viewing the facts in the light most favorable to Catellus, General arranged for treatment or disposal of a hazardous substance within the meaning of section 107(a)(3) of CERCLA.

II

Under CERCLA, a plaintiff may attempt to recover costs expended in the clean up of a contaminated site from four distinct categories of persons. Among these are "any person who by contract, agreement, or otherwise *arranged for disposal or treatment ... of hazardous substances* owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3) (emphasis added). At issue in this case is whether General's sale of the spent batteries

to Kirk falls into this category because it constitutes an arrangement for either disposal or treatment.

"Disposal" and "treatment" are defined in CERCLA, 42 U.S.C. § 9601(29), by reference to the definitions of those terms in section 1004 of the Solid Waste Disposal Act (SWDA), 42 U.S.C. § 6903. We have explained that the term "disposal" as imported from SWDA necessarily includes the concept of "waste." *3550 Stevens Creek Associates v. Barclays Bank*, 915 F.2d 1355, 1361–62 (9th Cir.1990) (*Stevens Creek*) (discussing the meaning of "disposal" in section 107(a)(2), but stating that the same definition applies to section 107(a)(3)), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). SWDA defines disposal as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid *waste* or hazardous *waste* into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment." 42 U.S.C. § 6903(3) (emphasis added). In *Stevens Creek*, we agreed with other circuits that "disposal" refers "only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." 915 F.2d at 1362. In *Stevens Creek*, for example, asbestos was not disposed of in a building when it was installed for use as insulation and fire retardant. *Id.* at 1361–62.

The definition of treatment in SWDA also necessarily includes the concept of "waste." Treatment is "any method, technique, or process ... designed to change the ... character or composition of any hazardous *waste* so as to neutralize such waste or so as to render such waste nonhazardous...." 42 U.S.C. § 6903(34) (emphasis added).

Thus, General could be said to have arranged for the disposal or treatment of the spent batteries only if the spent batteries could be characterized as waste. SWDA defines solid waste as "any garbage, refuse, sludge, ... and other discarded material." 42 U.S.C. § 6903(27). We have found this definition useful in determining whether a use made of a hazardous substance constitutes a disposal. *Stevens Creek*, 915 F.2d at 1361. We emphasize, however, that our reli-

ance on the terms used in SWDA to describe the characteristics of waste does not necessarily indicate that the specific hazardous substances covered by CERCLA are limited to those set forth as solid waste in SWDA. 42 U.S.C. § 9601(14)(C).

## A.

■ General argues that the spent batteries cannot be characterized as waste because they were being recycled and the lead extracted from them would be put to further productive use. In *Louisiana Pacific v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir.1994) (*ASARCO*), we further refined what is meant by "waste" and "discarded material" for the purpose of establishing liability under section 107(a)(3) of CERCLA. *ASARCO* dealt with the sale of slag, a by-product of copper smelting, by ASARCO, through a middleman, to logging companies who would use it instead of gravel as a ballast to provide firmer ground. When the slag became too mixed with other debris, the logyards would have it hauled away as waste. ASARCO was held liable under CERCLA for heavy metal contamination from the slag at the logyards and at a landfill where the slag was eventually taken. On appeal, ASARCO argued that it could not be held liable under Washington's product liability statute for introducing into commerce an "object possessing intrinsic value" and simultaneously for "arranging for disposal" under CERCLA. We held that "[a] by-product of a metallurgical process, if sold, can be a product for purposes of one and waste for purposes of the other. This is especially so given that CERCLA is to be broadly interpreted to achieve its remedial goals." *Id.* at 1575. We focused on the fact that the slag was a "by-product [ ] with a nominal commercial value," and that ASARCO wanted to "get rid of" the slag. *Id.*

*ASARCO*'s classification of slag as both a useful product and as a waste might have been read as contradicting our statement in *Stevens Creek* that a sale of a substance is not considered a discarding of waste if a productive use is made of the substance. *See Stevens Creek*, 915 F.2d at 1362. However, *ASARCO* distinguished *Stevens Creek* by

stating that it "involved products that were produced as the producers' principal business products, not by-products that the producers had to get rid of." *ASARCO*, at 1575 n. 6.

Catellus argues that this statement in *ASARCO* requires us to reverse the district court because the spent batteries were by-products and nonprincipal business products. Catellus reads *ASARCO* to hold that whenever a person sells a nonprincipal business product or a by-product, the thing sold is classified as "waste" and establishes that the sale constitutes an arrangement for "disposal" or "treatment" within the meaning of section 107(a)(3).

*ASARCO* does not create such a broad rule. *ASARCO* did not consider whether a by-product that is intended for recycling should be classified as waste for the purpose of section 107(a)(3) liability. Rather, the facts of the case limited the scope of its statements to the situation where the by-product being sold will have to continue to be used in its identical state until it is disposed of.

Reading the statements in *ASARCO* as broadly as Catellus urges and applying them to all types of recycling would require us to ignore statements made in *Stevens Creek* regarding the definition of waste. In *Stevens Creek*, we looked to the regulations implementing SWDA to explain the scope of the term "waste" as it informs the definition of "disposal" in CERCLA. 915 F.2d at 1361 & n. 13. Using SWDA regulations to interpret section 107(a)(3) is not inconsistent with our approach in *ASARCO*. In that case, our analysis relied heavily on *United States v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill. 1984), which itself based part of its decision on the definition of waste in SWDA regulations. *Id.* at 844.

■ Thus, the regulations implementing SWDA give us a more detailed discussion of when a recycled material should be considered a waste. But the question is: which regulations—the current ones or those in force at the time of the charged acts? We conclude that we are to look to the current SWDA regulations in interpreting section 107(a)(3) of CERCLA. CERCLA is a reme-

dial statute which operates on principles of strict liability. *Stevens Creek,* 915 F.2d at 1357. We have consistently applied it to acts creating contamination far before CERCLA was enacted in 1980. *See, e.g., Jones–Hamilton Co. v. Beazer Materials & Services,* 973 F.2d 688, 691 (9th Cir.1992) (*Jones–Hamilton*) (conduct occurring starting in 1970); *ASARCO,* 24 F.3d at 1571 (conduct occurring in 1978); *Stevens Creek,* 915 F.2d at 1356 (conduct occurring in 1963). Because the CERCLA liability scheme is generally unconcerned about whether a responsible party had notice at the time the contamination occurred that it would later be required to pay the costs of clean up, it is appropriate to apply current SWDA regulations in construing section 107(a)(3) regardless of when the acts of contamination occurred.

Turning then to the regulations, they define solid waste as any discarded material which is "[a]bandoned ... [r]ecycled ... or ... inherently wastelike." 40 C.F.R. § 261.2(a)(2) (1993). However, an exception explains that certain materials to be recycled are not solid waste. "Materials are not solid wastes when they can be shown to be recycled by being: (i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed." 40 C.F.R. § 261.2(e) (1993). The regulations define reclamation: "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. *Examples are recovery of lead values from spent batteries* and regeneration of spent solvents." 40 C.F.R. § 261.1(c)(4) (1993) (emphasis added).

Thus, under the regulations, General's spent batteries would clearly be defined as waste. Since they were "reclaimed," they would not fall under the exception that removes some reprocessed recycled material from the definition of waste. We are convinced by the Eleventh Circuit's persuasive discussion in *United States v. ILCO Inc.,* 996 F.2d 1126, 1131 (11th Cir.1993), that SWDA regulations reasonably classify lead components from spent batteries as waste.

Further support for our holding emerges as we look more closely at the details of the battery recycling procedure. An inescapable fact is that the leftover battery casings must be disposed of. The battery casings, like the slag in *ASARCO,* but unlike the lead plates within the casings, were not a subject of recycling. They retained their character as waste throughout and would have to be "gotten rid of," either by General, which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by Kirk after it bought the entire battery. General cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposed of the casings.

General argues that it did not "arrange" to dispose of the batteries because it did not control the eventual disposition of their remnants. This argument is precluded by our holding in *ASARCO.* ASARCO was not the party directly responsible for placing the slag at the logyards or at the landfills where it contaminated the ground. Rather, a middleman sold the slag to the logyards, and the logyards themselves arranged to have the slag hauled to the landfill. 24 F.3d at 1570–71. We have considered continued ownership or control of a hazardous substance to be evidence of arranging for disposal. *Jones–Hamilton,* 973 F.2d at 695. However, we have not required it. Requiring continued ownership or control for section 107(a)(3) liability would make it too easy for a party, wishing to dispose of a hazardous substance, to escape by a sale its responsibility to see that the substance is safely disposed of. Such a requirement "would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA." *United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1382 (8th Cir.1989). It is sufficient that the substance had the characteristic of waste, as we have defined it above, at the point at which it was delivered to another party.

### B.

■ The district court, in addition to holding there was no disposal, also held that the sale of the spent batteries could not constitute an "arrangement for treatment" because General did not retain control over the meth-

od by which they would be treated. However, there is no special requirement in treatment cases that there be a contract specifying how treatment will take place. As with *our interpretation of the arrangement for disposal provision,* all that is necessary is that the treatment be inherent in the particular arrangement, even though the arranger does not retain control over its details. Thus, when General sold the batteries to Kirk there was an arrangement for treatment created. Treatment is defined as, among others, rendering waste "amenable for recovery, ... or reduced in volume." 42 U.S.C. § 6903(34). When General sold the batteries to Kirk, it was in order that Kirk would treat the batteries by making the lead in the batteries "amenable for recovery." The processing by Kirk would also have the effect of "reduc[ing] in volume" the battery material that would have to be discarded.

■ However, we affirm on a different ground the district court's judgment that General could not be liable to Catellus for arranging treatment of the batteries. The statute imposes liability on "any person who ... arranged for ... treatment ... by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and *containing such hazardous substances.*" 42 U.S.C. § 9607(a)(3) (emphasis added). The statute thus creates a requirement that the treatment take place at the facility that contains the hazardous substances that are the subject of the clean up effort. None of the treatment activity arranged for by General and potentially causing contamination occurred at Catellus's property. It was the act of arranging for disposal that eventually led to the contamination of Catellus's property, according to its allegations. It is on this theory that Catellus may on remand seek to recover response costs from General.

REVERSED AND REMANDED.