CADILLAC FAIRVIEW/CALIFORNIA, INC., Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant-cross-claimant-Appellee,

and

Cabot, Cabot & Forbes Interim Co., Inc., et al., Defendants-third-party-Plaintiffs,

and

DOW CHEMICAL COMPANY, et al., Defendants-third-party-Plaintiffs–Appellants,

v.

UNIROYAL GOODRICH TIRE CO.; Goodyear Tire & Rubber Company, Third-party-defendants-Cross-claimants-Appellees.

No. 92–56379.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 31, 1994.

Decided Dec. 6, 1994.

Stephen McKae, Hardin, Cook, Loper, Engel & Bergez, Oakland, CA, for defendant-third-party plaintiff-appellant.

Elizabeth M. Weaver, Diana H. Koziol, Howrey & Simon, Los Angeles, CA, for third-party defendants-counter-claimants-appellees.

Catherine M. Sheafor, U.S. Dept. of Justice, Washington, DC, for defendant-cross-claimant-appellee.

Before: BROWNING, BOOCHEVER, and KLEINFELD, Circuit Judges.

PER CURIAM:

When denied access to its primary sources of natural rubber during World War II, the United States contracted with Dow Chemical Company, Goodyear Tire and Rubber Company, Shell Oil Company, and United States Rubber Company (the predecessor of Uniroyal Goodrich Tire Company) to construct, lease, and operate a government-owned, synthetic rubber manufacturing complex on land owned by the United States. The complex consisted of four units: a unit for the production of styrene operated by Dow; a unit for the production of butadiene operated by Shell; and two units for combining the styrene and butadiene to form synthetic rubber operated by the two rubber companies, Uniroyal and Goodyear.

Under the various operating agreements, Dow paid for materials used to produce styrene, and the rubber companies paid Dow for the finished styrene. The United States, however, retained ownership of the raw materials and the styrene. It reimbursed the companies for their costs and paid them a fee for operating the various plants.

The rubber companies converted into synthetic rubber only 60 to 70 percent of the styrene they received from Dow. The unconverted styrene contained contaminants from the rubber manufacturing process. The rubber companies pumped the contaminated styrene back to the styrene plant operated by Dow. The contaminated styrene entered a series of distillation columns which separated the contaminants from the styrene. The accumulated contaminants and other residue from the styrene manufacturing process collected on the bottom of the distillation columns and formed a substance known as "sulfur tar bottoms," consisting primarily of sulfur and unrecovered styrene, which Dow removed from the distillation columns and stored in pits near the styrene plant. Dow then pumped the recovered styrene back to the plants operated by the rubber companies for use in manufacturing synthetic rubber. Dow charged the rubber companies nine cents a pound for fresh styrene and credited them seven cents a pound for contaminated styrene returned to Dow for re-distillation.

■ After the war, the United States sold the complex to Shell. Shell manufactured synthetic rubber for a period and then sold the complex to a commercial real estate developer who razed the buildings and sold the land to Cadillac Fairview for development as an industrial park. Cadillac Fairview brought this action under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a), against Dow, the United States, and others to recover the cost of removing the styrene and other hazardous substances deposited on the land by Dow. Dow sought contribution from the rubber companies. A variety of cross-claims and third-party complaints followed, and the district court granted the motion of the rubber companies for summary judgment on Dow's claim for contribution. Dow appeals this decision.[1]

■ Dow may seek contribution from the rubber companies if they are liable or potentially liable under CERCLA. 42 U.S.C. § 9613(f). The rubber companies are liable if, among other conditions, they fall within one of the four classes of persons subject to the liability under section 107(a) of the Act. One of these classes consists of persons who "arranged for disposal or treatment" of hazardous substances at the facility. 42 U.S.C. § 9607(a)(3).[2] Dow contends the rubber

1. In 1984, the district court dismissed the complaint because the suit was not preceded by government action with respect to the site. We reversed. *Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691 (9th Cir.1988). Later the district court granted the motion of Goodyear, Uniroyal, Dow, and Shell for summary judgment on contractual indemnity claims against the United States. The district court has not entered judgment, however, and its ruling on indemnity is not before us.

The dissent argues that the district court abused its discretion by entering final judgment under Federal Rule of Civil Procedure 54(b) only on the claims against the rubber companies. We disagree. "The present trend is toward greater deference to a district court's decision to certify under Rule 54(b)." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir.1991). Accepting the dissent's suggestion that the less deferential standard of *Morrison–Knudsen v. Archer*, 655 F.2d 962 (9th Cir.1981), applies, the district court made findings specific enough to meet that standard. The district court found that the claims against the rubber companies were "factually and legally distinct from those asserted by and against other parties in this litigation," and "[t]he interests of fairness and justice favor the immediate entry of final judgment in favor of Goodyear and Uniroyal." These findings are supported by the record. The only claim against the rubber companies is that they are liable under CERCLA because they "arranged for disposal or treatment" of the contaminated styrene. 42 U.S.C. § 9607(a)(3). The claims against the other parties were based on their status as "owners" or "operators" of the plant. 42 U.S.C. § 9607(a)(2). As the district court found, the issues involved in determining "arranger" liability under CERCLA are distinct from those involved in determining "owner" or "operator" liability. The district court streamlined the litigation by eliminating the rubber companies from the case. Even if the government later indemnifies the parties, certification was appropriate; eliminating issues and parties from a case justifies the entry of final judgment on a claim, even if subsequent trial proceedings might obviate the need for an appeal. *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir.1987).

2. This section provides in full:

[A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous sub-

companies "arranged for ... treatment" of the contaminated styrene when they pumped it back to Dow for re-distillation.[3]

■ The rubber companies do not dispute that styrene is a "hazardous substance" under CERCLA. *See* 40 C.F.R. § 302.4. They do not dispute that Dow "treated" the styrene when it re-distilled the contaminated styrene to remove the contaminants. *See* 42 U.S.C. § 9601(29) (incorporating 42 U.S.C. § 6903(34)). They also agree that Dow "released" the contaminants and associated styrene into the environment when it dumped the residue from the distillation columns into pits at the site. *See* 42 U.S.C. § 9601(22). However, the rubber companies contended and the district court held that they did not "arrange[ ] for ... treatment" of the contaminated styrene because they did not own the contaminated styrene during the re-distillation process after returning the contaminated styrene to Dow, and they did not control the re-distillation process that resulted in the release of the contaminants and associated styrene.

■ Neither the language of the statute nor the cases interpreting it impose these limits on section 107(a)(3).[4] Section 107(a)(3) extends liability to "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances." Liability is not limited to those who own the hazardous substances, who actually dispose of or treat such substances, or who control the disposal or treatment process. The language explicitly extends liability to persons "otherwise arrang[ing]" for disposal or treatment of hazardous substances

whether owned by the arranger or "by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity." Accordingly, we have extended liability under section 107(a)(3) to persons who have sold and therefore no longer own the hazardous substances, *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 752 (9th Cir.1994); *Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1570–71 (9th Cir.1994), and to persons who have no control over the process leading to release of the substances, *Catellus*, 34 F.3d at 752; *Jones–Hamilton Co. v. Beazer Materials & Servs.*, 973 F.2d 688 (9th Cir.1992); *see also United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373 (8th Cir.1989).

■ On a motion for summary judgment, the question is whether the fact-finder could infer from all the circumstances that " 'a transaction in fact involves an arrangement for the disposal [or treatment] of a hazardous substance.' " *Jones–Hamilton*, 973 F.2d at 695 (quoting and adopting analysis of *Aceto*, 872 F.2d at 1381); *see also Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir.1990) (rejecting a *per se* rule that only party who owns a hazardous substance and controls the disposal process is liable under § 107(a)(3)). The record before the district court was sufficient to support a finding that the rubber companies arranged to transfer contaminated styrene to Dow for completion of the re-distillation process that led to the release of the hazardous substances. Summary judgment for the rubber companies was therefore inappropriate. *See Catellus*, 34 F.3d at 752 ("It is sufficient

---

stances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ...

... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable....

42 U.S.C. § 9607(a)(3) and (4).

**3.** The rubber companies argue Dow did not raise this issue below. Although Dow did not initially oppose the motion for summary judgment on the ground the rubber companies arranged for the treatment of the contaminated styrene, the issue is properly before us since Dow made the argument in a motion to vacate the grant of summary

judgment, and the district court rejected it on its merits in an order supplementing its ruling on the summary judgment motion. *Cf. Gon v. First State Ins. Co.*, 871 F.2d 863, 866–67 (9th Cir. 1989).

**4.** Section 107(a)(3) must be given "a liberal judicial interpretation ... consistent with CERCLA's overwhelmingly remedial statutory scheme." *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1380 (8th Cir.1989) (quotation omitted); *accord Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990); *see also 3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1363 (9th Cir. 1990).

that the substance had the characteristic of waste ... at the point at which it was delivered to another party.").

The flow of fresh styrene from Dow to the rubber companies for the manufacture of synthetic rubber, the shipment of contaminated styrene to Dow for removal of contaminants, and the return of fresh styrene to the rubber companies for further production of synthetic rubber, was a prearranged process essential to the production of synthetic rubber at the complex. The rubber companies returned the styrene to Dow only when the styrene became too contaminated for further use in producing rubber. Dow removed the contaminants and returned the clean styrene to the rubber companies for continued use until it again became contaminated and was again sent to Dow for re-distillation. Removal and release of the hazardous substances was not only the inevitable consequence, but the very purpose of the return of the contaminated styrene to Dow.

█ The rubber companies emphasize the fact that contaminated styrene had value on the market, and that Dow credited their accounts seven cents for each pound they sent to Dow for treatment. They seek to avoid arranger liability under section 107(a)(3) by relying upon cases holding that sale of a hazardous substance in the form of a useful product is not an arrangement for disposal or treatment within the meaning of the section. *See, e.g., Florida Power & Light,* 893 F.2d at 1317. As these authorities recognize, however, a transaction is not beyond the reach of section 107(a)(3) simply because it is cast in the form of a sale. *Catellus,* 34 F.3d at 752. The question remains whether in light of all the circumstances the transaction involved an arrangement for disposal or treatment of a hazardous waste. *See id.; ASARCO,* 24 F.3d at 1570–71; *Jones–Hamilton,* 973 F.2d at 695; *Florida Power & Light,* 893 F.2d at 1318; *Aceto,* 872 F.2d at 1381.

A trier of fact could readily conclude on the facts thus·far in the record that the transfer of contaminated styrene to Dow by the rubber companies was not a sale of a useful product but an arrangement for treatment of a hazardous waste. The rubber companies were engaged in the manufacture and sale of synthetic rubber, not contaminated styrene. After removal of the contaminants, Dow returned the clean styrene to the rubber companies for further use in the manufacture of rubber. Although Dow paid the rubber companies seven cents for each pound of contaminated styrene they sent to Dow, it charged them nine cents for each pound of uncontaminated styrene it returned. A trier of fact could find the substance of the transactions to have been that the rubber companies paid Dow two cents per pound to remove the contaminants from the used styrene and return the fresh styrene to them— that they simply arranged and paid for treatment of the contaminated styrene by Dow.

REVERSED and REMANDED for proceedings consistent with this opinion.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

After the Japanese captured Malaya during World War II, we were cut off from the world's major supply of rubber. A substitute was essential to the war effort. Fortunately, we had obtained from the Germans the secret of how to make artificial rubber from styrene and butadiene. The government built a synthetic rubber plant and hired several companies to run different parts of it. The rubber companies, as government agents working with government-owned materials on government property, "arranged" nothing. They did what they were told, to furnish the government with the rubber needed for the war. The valuable styrene was piped back into the chemical plant, when it fell below specified purity requirements, for distillation and reuse.

We need not decide anything regarding the merits of this case. We should not resolve the difficult legal issues presented here, because there is no final judgment on all issues and all parties, and when there is one, it is likely to moot the dispute we now resolve. All the companies involved had clauses in their contracts with the government requiring the government to hold them harmless for any liabilities arising out of their operation of the rubber plant. The district court has already ordered that the

government indemnify both Dow Chemical and the rubber companies for any money they have to pay on account of the ground contamination at issue in this litigation. The district court granted final judgment to the rubber companies against Dow Chemical, but did not grant final judgment on its order against the government. If the district court ultimately renders a judgment in accord with its order, then Dow Chemical will not owe any of its own money to anyone and so will not be entitled to contribution from the rubber companies. Although the government might step into Dow's shoes, it will also step into the rubber companies' shoes, so any right to contribution will disappear. This opinion on the merits of the case will therefore be moot.

We have previously cautioned against routine issuance of Rule 54(b) judgments. In an opinion by Judge, now Justice, Kennedy, we held that

> [j]udgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties. The trial court should not direct entry of judgment under Rule 54(b) unless it has made specific findings setting forth the reasons for its order. Those findings should include a determination whether, upon any review of the judgment entered under the rule, the appellate court will be required to address legal or factual issues that are similar to those contained in the claims still pending before the trial court. A similarity of legal or factual issues will weight heavily against entry of judgment under the rule, and in such cases a Rule 54(b) order will be proper only where necessary to avoid a harsh and unjust result, documented by further and specific findings.

*Morrison–Knudsen Co. v. Archer,* 655 F.2d 962, 965 (9th Cir.1981).

Subsequently we called *Morrison–Knudsen* "outdated and overly restrictive." *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991). But a subsequent panel cannot modify the law of this circuit by a critical remark. *See United States v. Lewis,* 991 F.2d 524, 526 n. 1 (9th Cir.1993). *Morrison–Knudsen* is the law of this circuit unless and until we overrule it en banc.

The district court order in this case did not make the specific findings and determination required by Rule 54(b) as construed by *Morrison–Knudsen.* We should exercise our discretion to dismiss the appeal because, based on the district court's already issued order, if the case proceeds to final judgment in district court, and that judgment stands, we shall never have to decide the issue now before us.

I respectfully disagree with the majority's resolution of the substantive issue in this case as well. Dow Chemical did not establish that the rubber companies "arranged" for anything. They were agents of the United States doing exactly what they were told in a government facility with government-owned materials. We might as well impose environmental liability on those who served in the Army during World War II for the lead bullets they left in the soil.