**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA DEPARTMENT OF TOXIC
SUBSTANCES CONTROL,
                    *Plaintiff-Appellant,*

v.

ALCO PACIFIC, INC.; MORRIS P.
KIRK; DAVIS WIRE CORPORATION;
EXIDE TECHNOLOGIES (GNB); P.
KAY METAL SUPPLY, INC.; LEAD
PRODUCTS COMPANY, INC.;
PASMINCO, INC.; QUEMETCO, INC.;
RSR CORPORATION; and J.L.
SHEPHERD & ASSOCIATES,
                    *Defendants-Appellees.*

No. 05-55962

D.C. No.
CV-01-9294 SJO
(FMOx)

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
May 15, 2007—Pasadena, California

Filed November 28, 2007

Before: Raymond C. Fisher and Richard R. Clifton,
Circuit Judges, and Jeremy D. Fogel, District Judge.*

Opinion by Judge Fogel

---

*The Honorable Jeremy Fogel, United States District Judge for the
Northern District of California, sitting by designation.

15257

## COUNSEL

Laurie R. Pearlman, Supervising Deputy Attorney General, Edward H. Ochoa, Deputy Attorney General, Office of the Attorney General, San Diego, California, for the appellant.

Chris M. Amantea, Brandon J. Roker, Charles E. Weir, McDermott Will & Emery LLP, Los Angeles, California, Eugene J. Frett, Sperling & Slater, P.C., Chicago, Illinois, for the appellees.

## OPINION

FOGEL, District Judge:

The California Department of Toxic Substances Control ("the State") brought this cost recovery action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, seeking cleanup costs arising from the release of hazardous substances at a former lead processing facility ("the site") operated by Alco Pacific, Inc. and Morris P. Kirk (collectively, "Alco"). The State asserts that Defendants RSR Corporation ("RSR"), Quemetco, Inc. ("Quemetco"), Davis Wire Corporation ("Davis"), Pasminco, Inc. ("Pasminco"), and P. Kay Metal Supply, Inc. ("PKM") (collectively "Defendants") sold lead content materials to Alco and thus are subject to "arranger" liability for contamination of the site under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). The district court granted summary judgment for Defendants after concluding as a matter of law that the subject sales fell within the "useful product doctrine" and thus did not constitute arrangements for disposal or treatment of hazardous wastes under CERCLA. *California Department of Toxic Substances Control v. Alco Pacific, Inc.*, No. CV-01-9294 (C.D. Cal., Feb. 6, 2004). We have jurisdiction over the State's timely appeal under 28 U.S.C. § 1291. We reverse and remand.

## BACKGROUND

Alco operated a lead processing facility on the site from approximately 1950 to 1990. During that period Alco refined

and reclaimed lead from raw materials acquired from thousands of sources. These materials included lead ingots, automobile batteries, scrap metal, wheel weights, dross and slag.

The latter two materials are particularly important in the context of the instant appeal. "Dross" is the material that rises to the surface of melted metal that is not perfectly pure. Dross typically is skimmed off the molten metal and stored for later use or disposal. Depending on the care taken in skimming, the dross thus removed may contain a significant percentage of the metal itself. "Slag" also results from the separation of impurities from metal during the smelting and refining process. Alco purchased high lead content dross and slag that were by-products of other lead processors' operations. Material was deemed to have high lead content if it contained approximately thirty percent recoverable lead. The price Alco paid for the dross, slag and other raw materials it purchased was based upon an analysis of the lead content of the material and the published market price of lead at the time of the transaction, as measured by the commodities price index quoted in daily newspapers.

After processing the materials supplied by Defendants and others, Alco sold the resulting refined and reclaimed lead in various forms. For example, Alco cast lead sailboat keels and produced sheet metal and lead anodes. Alco also sold lead in the form of ingots or babbitts. Alco disposed of the waste material resulting from its operations—low lead content slag —at a facility authorized to accept hazardous wastes. Alco did not dispose of dross generated during its operations, but rather used the dross again in its smelting process.

### Defendants RSR and Quemetco

RSR is the parent corporation of Quemetco. RSR did not sell or transfer any materials to Alco, but it allegedly arranged for the sale of materials to Alco on behalf of Quemetco. Quemetco is a lead smelter that reclaims lead from scrap and lead-

acid automobile batteries. Though Quemetco sold several different types of lead content materials to Alco, the parties have focused on sales of lead content slag.

Quemetco generates three types of slag: "first run slag" or "reverb slag," which is produced during the initial processing of scrap through a reverberatory furnace; "second run slag" or "rerun slag," which has been processed a second time; and "inert slag" or "waste slag," which has been processed at least twice and is ready for disposal. On October 25, 1988, Quemetco sold to Alco 47,920 pounds of "rerun antimonial lead slag." On October 31, 1988, Quemetco sold to Alco 49,580 pounds of "rerun antimonial lead slag." Alco paid seven cents per pound on both transactions, resulting in total payments of $3,354.40 on the first purchase and $3,470.60 on the second purchase.

**Defendant Davis**

Davis[1] operated a wire manufacturing company that used molten lead to treat wire. A by-product of this process was lead content dross that was composed of lead and coke. Between 1978 and 1988, Davis periodically sold lead content dross to Alco at varying prices, depending on the amount of lead contained in the particular shipment. Alco paid Davis at least $110,000 for lead content dross during this period.

**Defendant Pasminco**

Pasminco operated a zinc smelting facility. Between 1978 and 1983, Pasminco periodically sold lead content dross and other materials to Alco.

---

[1]Prior to its bankruptcy, Davis Wire Corporation was known as Davis Walker Corporation. Davis Wire Corporation sought summary judgment in this action on bankruptcy grounds, but the district court denied that motion, and Davis Wire Corporation voluntarily dismissed its appeal of that ruling. Davis Wire Corporation and Davis Walker Corporation are referred to collectively herein as "Davis."

**Defendant PKM**

PKM operates a solder manufacturing facility, reclaiming tin and lead in a manner similar to that used by Alco. PKM reclaims tin, lead and other metals and converts them into solder that it sells to others. PKM sold various materials to Alco, including lead dross, solder dross and antimonial lead dies. The parties have focused on the dross transactions. Between 1982 and 1989, PKM periodically sold lead and solder dross to Alco at varying prices. PKM characterizes these transactions as part of a "conversion" agreement whereby Alco processed the dross to strip it of impurities and then returned the extracted refined metal to PKM. PKM paid a fee for this conversion process.

**Contamination of the Site**

During Alco's operations, molten lead, slag and other materials, including dust and residue from the materials, occasionally spilled or otherwise were deposited onto the ground at the site. Additionally, solidified lead and slag were stored on the ground at least temporarily. The State determined that surface dust, soils and slag piles at the site were contaminated with lead. It incurred significant cleanup costs at the site and filed the instant action seeking reimbursement from Defendants on the theory that the above-described transactions constituted arrangements for the disposal or treatment of hazardous waste under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). The State also seeks declaratory relief with respect to any future cleanup costs.

The district court granted summary judgment for Defendants, concluding as a matter of law that Defendants' transactions with Alco were within the scope of the useful product doctrine. The State subsequently reached settlement with the remaining defendants in the case, and the district court entered a final order and consent decree resolving all outstanding issues.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* We may affirm on any ground supported by the record. *Id.*

## DISCUSSION

**[1]** Under CERCLA, a plaintiff may attempt to recover cleanup costs from four categories of persons, defined at 42 U.S.C. § 9607(a). Only the third category, persons defined as "arrangers," is at issue here:

> [A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a)(3). We recently held that arranger liability encompasses not only transactions in which the central purpose is the disposal of hazardous waste but also "transactions that contemplate disposal as a *part* of, but not the focus of, the transaction." *United States v. Burlington N. & Santa Fe Ry. Co.*, 479 F.3d 1113, 1139 (9th Cir. 2007).

CERCLA itself does not define the terms "disposal" and "treatment," but instead incorporates the definitions of those terms as set forth in the Solid Waste Disposal Act ("SWDA"). *See* 42 U.S.C. § 9601(29). The SWDA defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). "Treatment" is defined as:

any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume.

42 U.S.C. § 6903(34).

**[2]** We have held that these definitions necessarily implicate the concept of "waste," and have developed a body of case law distinguishing between the disposal or treatment of "waste" and the sale of a "useful product." *See, e.g.*, *Burlington*, 479 F.3d at 1140-41; *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998); *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 750 (9th Cir. 1994). A person may be held liable as an "arranger" under § 9607(a)(3) only if the material in question constitutes "waste" rather than a "useful product." *A & W Smelter*, 146 F.3d at 1112; *Catellus*, 34 F.3d at 750. Application of this distinction has been referred to as the "useful product doctrine."

Because the doctrine has developed piecemeal through case law, its contours are not entirely clear. In *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir. 1994), one of our early cases touching on the useful product doctrine, the relevant issue was whether a copper smelter's sale of slag to

logyards via a middleman gave rise to liability under CER-CLA. The logyards used the slag like gravel, spreading it on the ground to provide a firmer surface to aid in the storage of logs and operation of heavy equipment. *Id.* at 1570-71. When the slag became mixed with wood waste and other debris, the logyards hauled it to a landfill and put down a new load of slag. *Id.* at 1571, 1575. The logyards and landfill eventually became contaminated with heavy metals from the slag, and the smelter, ASARCO, was held liable under CERCLA. *Id.*

On appeal, we did not refer explicitly to the useful product doctrine, but phrased the question before us as "whether the sale of slag to the logyards can simultaneously be both the sale of a product with intrinsic value in trade or commerce under Washington law, and the disposal of a hazardous substance under CERCLA." *Id.* at 1574. We answered this question in the affirmative, concluding that slag was a by-product of ASARCO's principal business—copper smelting—and that the slag had only nominal commercial value in that the logging companies paid only $3.50 per ton. *Id.* at 1575. Prior to attempting to develop a market for its slag, ASARCO had dumped the slag into a nearby bay with the permission of the local park district. *Id.* We distinguished other cases in which the sale of products was not considered disposal of hazardous waste on the ground that those cases involved "the producers' principal business products, not by-products that the producers had to get rid of." *Id.* at 1575 n.6. Under the circumstances, ASARCO could be held liable as an arranger for contamination caused by the slag ultimately sold to logyards. *Id.* at 1575.

In *Catellus Dev. Corp. v. United States,* 34 F.3d 748 (9th Cir. 1994), the defendant auto parts dealer, General, accepted used automotive batteries from customers as trade-ins. *Id.* at 749. General in turn sold the batteries to a battery cracking plant that extracted and smelted the lead and dumped the battery casings. *Id.* at 749-50. Tons of crushed battery casings

ended up on the property of the plaintiff, Catellus, and contaminated it with lead. *Id.* at 750.

We declined to read *ASARCO* as announcing a broad rule that any sale of a nonprincipal business product or by-product necessarily is an arrangement for disposal or treatment under § 107(a)(3). *Catellus*, 34 F.3d at 751. *ASARCO* was limited to "the situation where the by-product being sold will have to continue to be used in its identical state until it is disposed of." *Id.* However, given the battery recycling procedure at issue, "[a]n inescapable fact is that the leftover battery casings must be disposed of." *Id.* at 752. The battery casings had to be "gotten rid of" either by General, which could have cracked the casings itself before selling the scrap lead, or by the purchaser who bought the entire battery. *Id.* We concluded that "General cannot escape having the battery casings defined as discarded material simply by selling the battery to another party who then disposed of the casings." *Id.*

We expressly rejected General's argument that it could not be held liable as an arranger under CERCLA because it did not control the eventual disposition of the batteries' remnants. *Catellus*, 34 F.3d at 752. "Requiring continued ownership or control for section 107(a)(3) liability would make it too easy for a party, wishing to dispose of a hazardous substance, to escape by a sale its responsibility to see that the substance is safely disposed of." *Id.* It is sufficient that the substance has "the characteristic of waste" at the time it is delivered to another party. *Id.* We likewise held that there is no requirement in treatment cases that there be a contract specifying how treatment will take place, stating that, "[a]s with our interpretation of the arrangement for disposal provision, all that is necessary is that the treatment be inherent in the particular arrangement, even though the arranger does not retain control over its details." *Id.* at 753.

In *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562 (9th Cir. 1994), we addressed the appropriate char-

acterization of a series of transactions between manufacturers of synthetic rubber and Dow, a supplier of styrene used in rubber production. The rubber companies purchased styrene from Dow, but could convert only sixty to seventy percent of that styrene into rubber. *Id.* at 564. The unconverted styrene contained contaminants from the rubber manufacturing process, so the rubber companies sent the contaminated styrene to Dow for re-distillation. *Id.* Dow cleaned the styrene of contaminants, which were deposited in pits near the styrene plant, and returned the recovered styrene to the rubber companies for use in rubber manufacturing. *Id.* Dow charged the rubber companies nine cents a pound for styrene and credited them seven cents a pound for contaminated styrene returned to Dow for re-distillation. *Id.* When it was sued for contamination caused by styrene and other hazardous substances at the site of its operations, Dow sought contribution from the rubber companies as arrangers under section 107(a)(3) of CERCLA. *Id.*

Citing *ASARCO* and *Catellus*, we held that it was not dispositive that the rubber companies did not own the contaminated styrene during the re-distillation process and did not control the re-distillation process that resulted in the release of contaminants. *Id*. at 565. We likewise held that it was not dispositive that the transactions in question were characterized as sales. *Id.* at 566. Noting that the question on summary judgment is, "whether the fact-finder could infer from all the circumstances that a transaction in fact involves an arrangement for the disposal or treatment of a hazardous substance," *id.* at 565 (internal quotation marks, alterations, and citations omitted), we concluded that, "[a] trier of fact could find the substance of the transactions to have been that the rubber companies paid Dow two cents per pound to remove the contaminants from the used styrene and return the fresh styrene to them—that they simply arranged and paid for treatment of the contaminated styrene by Dow." *Id.* at 566. We found that, "[r]emoval and release of the hazardous substances was not

only the inevitable consequence, but the very purpose of the return of the contaminated styrene to Dow." *Id.*

In *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107 (9th Cir. 1998), the United States Environmental Protection Agency ("EPA") ordered A & W to dispose of an ore pile at its smelting facility because the pile contained quantities of naturally occurring lead and slag. A & W complied and filed a complaint seeking reimbursement of its compliance costs under CERCLA. *Id.* at 1109. The district court granted summary judgment for the EPA and its co-defendants. We reversed and remanded on the ground that there were triable issues of material fact as to whether the ore pile constituted "waste" or a "useful product." *Id.* at 1113. Although the district court had been persuaded that the pile could not be a useful product because it was unusable in its current state, we noted that "raw materials, by definition, can't be used in their current state" but rather "must be refined—a process which separates the useful portion from the waste." *Id.* at 1112. The pile was waste only if the ore was mixed with so much slag that it was no longer useable for A & W's principal business.[2] *Id.* at 1113. Whether this was the case could not be answered on the existing record, but required consideration of other relevant evidence regarding A & W's actions and the market value of the ore pile, if any. *Id.*

We recently commented at length on arranger liability and the useful product doctrine in *United States v. Burlington N. & Santa Fe Ry. Co.,* 479 F.3d 1113 (9th Cir. 2007). In that case, Brown & Bryant, Inc. ("B & B"), operated an agricultural chemical storage and distribution facility. *Id.* at 1121. As

---

[2]Indeed, *A & W Smelter* recognized that A & W's contract to have another company process the ore "suggests the material was a useful product," even though "[s]melting unprocessed ore was A & W's business" and such a contract was necessary because the ore did not contain enough precious metal to "justify smelting by A & W's methods." *A & W Smelter*, 146 F.3d at 1109, 1113.

part of its business, B & B purchased, stored and distributed chemicals manufactured by Shell. *Id.* at 1122. The chemicals were shipped to B & B in common carrier trucks and transferred to large storage tanks by hoses. *Id.* The transfer process was messy, with frequent spills. *Id.* Moreover, the chemicals were corrosive and caused leakage in storage tanks only a few years old. *Id.* Federal and state agencies ultimately found contamination on the B & B site. *Id.* at 1123. Following a bench trial, the district court held Shell partially responsible for cleanup costs as an arranger under CERCLA. *Id.* We affirmed Shell's arranger liability on appeal. *Id.* at 1142.

**[3]** In discussing the necessity of adopting an expansive view of arranger liability in light of CERCLA's goals, we observed that even "[a]rranging for a transaction in which there necessarily would be leakage or some other form of disposal of hazardous substances is sufficient" to impose arranger liability. *Id.* at 1140-41. While acknowledging that we have "refused to hold manufacturers liable as arrangers for selling a useful product containing or generating hazardous substances that *later* were disposed of," we held that "[t]he useful product cases have no applicability where, as here, the sale of a useful product necessarily and immediately results in the leakage of hazardous substances." *Id.* We concluded that, "[i]n that circumstance, the leaked portions of the hazardous substances are *never* used for their intended purpose." *Id.* Because leakage of the Shell chemicals was inherent in the transfer process arranged by Shell and contemporaneous with that process, the useful product doctrine was inapplicable. *Id.* We emphasized that, "Shell's liability derives not from its role as a manufacturer of a useful product but rather from its role in leakage prior to use." *Id.* at 1140 n.31. Shell owned the chemicals at the time the sale was entered into, and had sufficient control over and knowledge of the transfer process to be considered an "arranger" under CERCLA. *Id.* at 1142.

In the instant case, the district court attempted to synthesize our holdings into a cohesive approach to arranger liability and

the useful product doctrine. Relying primarily upon *ASARCO* and *A & W Smelter*, the district court crafted a three factor test, and used it to conclude that all of the ingots and other high quality lead sold to Alco fall within the useful product doctrine. The court noted that the slag and dross sold to Alco present a more difficult case. However, the court was persuaded that these materials also fall within the useful product doctrine because Alco paid prices that were tied to the prevailing commodity price of lead and the lead content in the particular dross or slag, and because Alco purchased the dross and slag as raw materials for its smelting business in lieu of purchasing virgin ore. The court found that although dross and slag were by-products of Defendants' businesses, on the record before it dross and slag could not be characterized as worthless waste that needed to be disposed of but rather were valuable commodities.

**[4]** While at this juncture we refrain from expressly adopting or crafting a concrete test for this fact-intensive inquiry, we agree that the factors upon which the district court relied, including (1) "the 'commercial reality' and value of the product in question"; (2) "a factual inquiry into the actions of the seller in order to determine the intent underlying the transaction"; and (3) "whether the material in question was a principal product or by-product of the seller," are among the factors appropriate to consider in determining "whether in light of all the circumstances the transaction involved an arrangement for disposal or treatment of a hazardous waste." *Cadillac Fairview*, 41 F.3d at 566. However, because a reasonable finder of fact could infer from the evidence in the record that this question should be answered in the affirmative, we conclude that the district court misapplied the factors in granting summary judgment for Defendants.

The first factor—the "commercial reality" of the transaction—most strongly supports the district court's grant of summary judgment, particularly in light of the undisputed fact that the prices at which the dross and slag were sold were

linked to the market price of lead. The district court correctly found that the link between the commodities market price of lead and the price paid by Alco for the Defendants' dross and slag supported their claim that they were selling a useful product, not disposing of waste. It is not particularly significant that Defendants received only a fraction of the market price: the dross and slag themselves contained only a fraction of lead, and clearly Alco would have to expend further resources in order to extract whatever portion of that fraction it could ultimately successfully reclaim. Nor does it matter that the prices at which the dross and slag were sold were "low" in some absolute sense. A product does not become waste simply because it is inexpensive. Rather, it is the de-linking of the price of a substance from the market value of whatever might feasibly be extracted from it that supports a conclusion that a price is nominal and a sale only a disguised disposal. There is no conclusive evidence in the record of such de-linking.

Price, however, is only one indicator of whether a transaction was an arrangement for the disposal of waste or the sale of a useful product. Neither a product's absolute price nor its price in comparison with the value of the materials that might be reclaimed from it is dispositive by itself. Evidence of the frequency and volume of transactions, the parties' prior dealings, the nature of the processing carried out by the buyer and previous or alternative arrangements for handling the by-products of the seller's business operations also are potentially relevant. As the district court recognized here, "it is clear that the dross and slag were by-products of the various Defendants," not their principal product. This finding undercuts the conclusion that the commercial reality factor unambiguously supports summary judgment for the defendants. *See RSR Corp. v. Avanti Dev., Inc.*, 68 F. Supp. 2d 1037 (S.D. Ind. 1999) (distinguishing between "persons who sell a used product to dispose of it, and those whose sale is their main profit-making venture").

[5] On the present record, a reasonable finder of fact could conclude—after a full factual inquiry into the actions of the

parties—that almost all of the transactions were intended as arrangements for the disposal or treatment of a hazardous substance. The existence of triable issues of material fact is particularly clear with respect to PKM. PKM's transactions with Alco were not straightforward sales; instead they involved a conversion agreement under which Alco cleaned PKM's dross of impurities and then returned the extracted refined metal to PKM. PKM paid a fee for this conversion process that was incorporated into the sale price of the dross. These facts are extremely close to those in *Cadillac Fairview*, in which we held that the useful product doctrine would not apply if the true nature of the transactions between the rubber companies and Dow was an arrangement for treatment of contaminated styrene. *Cadillac Fairview*, 41 F.3d at 566.

Similarly, a reasonable fact-finder could conclude that Davis and Pasminco sold slag and dross to Alco so that Alco would treat and dispose of the material. Neither company was primarily engaged in the sale of lead products. Davis was engaged in the manufacture and sale of wiring products, not slag and dross. *See id.* Pasminco operated a zinc smelting facility. Even though the transactions between Davis, Pasminco and Alco were "cast in the form of a sale," *id.*, a reasonable fact-finder could conclude that Davis and Pasminco sold the by-products of their manufacturing processes primarily for treatment and disposal purposes.

Defendant Quemetco presents a closer question. As the district court recognized, one of Quemetco's primary business activities *was* selling recycled lead products to third parties. Accordingly, the State's claim that Quemetco's primary intent in contracting with Alco was to "get rid of" its slag and dross may be more difficult to prove. Nonetheless, it is undisputed that slag and dross were by-products of Quemetco's operations, and thus a fact-finder reasonably could infer that the sales between Quemetco and Alco at least in part involved arrangements for disposal or treatment of a hazardous sub-

stance. Accordingly, we reverse the district court's grant of summary judgment as to all defendants.

**[6]** The State requests that we not only determine that the district court erred in granting summary judgment for Defendants but also conclude as a matter of law that the useful product does *not* apply in this case. The State argues that some spillage and leakage is inevitable during smelting, and that Defendants were well aware of this fact. The State also argues that a significant portion of the dross and slag sold to Alco necessarily constituted "waste" that would have to be disposed of eventually, and that Defendants in essence shifted this responsibility to Alco by means of the transactions at issue. However, while these facts obviously are relevant to the appropriate characterization of the transactions as a whole, they are not the only relevant facts; as discussed above, the fact that the pricing of the slag and dross clearly was related to the market value of lead cuts the other way. Thus, the current record is insufficient to establish as a matter of law that the useful product doctrine does not apply in this case. As we held in *Cadillac Fairview* and discussed above, the trier of fact must consider the totality of circumstances in determining the proper characterization of the relevant transactions. *Id.*

The State also argues that the useful product doctrine applies only to new products, manufactured specifically for the purpose of sale, and can never apply to by-products. The case cited for this proposition, *State of California v. Summer Del Caribe, Inc.*, 821 F. Supp. 574 (N.D. Cal. 1993), is a district court decision that pre-dates all of the Ninth Circuit decisions discussed above. In *Catellus,* we clarified explicitly that classification of the material in question as "a nonprincipal business product or a by-product" is *not* dispositive of the applicability of the useful product doctrine. *Catellus*, 34 F.3d at 751.

Finally, relying upon *A & W Smelter*, the State argues that the useful product doctrine applies only if the material in

question could be used in the producer's principal business. *A & W Smelter* does discuss the usefulness of the ore pile at issue in terms of A & W's principal business, stating that, "[i]f the ore was mixed with enough slag so that it was no longer usable for A & W's principal business, then it was waste." *A & W Smelter*, 146 F.3d at 1113. However, that decision simply assumed without discussion that slag is a waste by-product that never can constitute a useful product. *Id.* The facts of the case did not involve the sale of slag from one smelter to another. Thus, *A & W Smelter* cannot be read as establishing a general rule that material can never fall within the useful product doctrine unless the material is useful to the producer's principal business.

At oral argument, Defendants asserted that finding arranger liability here will have adverse effects on the market, because companies with commercially useful by-products will resort to disposal rather than resale to avoid potential CERCLA liability from contamination arising out of subsequent reclamation or manufacturing processes in which they have no part and over which they have no control. While Defendants' policy argument has some appeal, both the relevant statutory language and our case law support a broad application of CERCLA's liability provisions. *See Burlington*, 479 F.3d at 1138-39. Moreover, Defendants' policy concerns have not gone unheeded by Congress. "[O]ne of the [Superfund Recycling Equity] Act's purposes is 'to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund Liability provisions.' " *Gould, Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162, 171 (3d Cir. 2000) (quoting Pub. L. No. 106-113, § 6001(a)(3), 113 Stat. 1501, 1501A-598 to 1501A-599 (1999)). Congress created a recycling exemption to encourage reuse of materials, 42 U.S.C. § 9627, an exemption Defendants unsuccessfully sought to claim before the district court.[3]

---

[3]Defendants urge us to affirm the district court's judgment on the independent ground that the transactions at issue constituted arrangements for

**[7]** Accordingly, we reverse the district court's grant of summary judgment for Defendants under the useful product doctrine and remand for further proceedings consistent with this opinion.[4]

## REVERSED AND REMANDED.

---

recycling of scrap metal and thus fell within the recycling exemption codified at section 127 of the Superfund Recycling Equity Act, 42 U.S.C. § 9627. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) (holding that a judgment may be affirmed on any ground supported by the record). Under that statute, "a person who arranged for recycling of recyclable material" is exempt from arranger liability under CERCLA. 42 U.S.C. § 9627(a)(1). Scrap metal is defined as recyclable material under the statute provided that certain requirements are met. 42 U.S.C. § 9627(d). The district court properly concluded that Defendants failed to offer evidence establishing at least one such requirement, that the recyclable material met a commercial specification grade at the time of the transaction, *see* 42 U.S.C. § 9627(c)(1), and thus properly denied Defendants' motion for summary judgment under the recycling exemption. Defendants point to a 2003 publication of the Institute of Scrap Recycling Industries, Inc., entitled "Scrap Specifications Circular 2003," but fail to explain how this 2003 language established a specification grade for materials sold to Alco in the 1970s and 1980s. Defendants also point to the testimony of Alco's designee, who stated that Alco preferred to purchase lead slag with at least thirty percent lead content, but fail to explain why Alco's preference constituted a "commercial specification grade" within the meaning of the statute.

[4]The State also appealed the district court's order excluding the testimony of its expert witness, Mr. Brodwin. Because Mr. Brodwin's proposed testimony concerned the applicability of the recycling exemption, this aspect of the appeal is moot.