**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TEAM ENTERPRISES, LLC,
                    *Plaintiff-Appellant,*

          v.

WESTERN INVESTMENT REAL ESTATE
TRUST, AKA Western Properties
Trust; WPT, INC.,
                    *Defendants,*

       and

PK II CENTURY CENTER LP; PAN
PACIFIC RETAIL PROPERTIES, INC., as
a corporation and as successor-in-
interest to Western Investment
Real Estate Trust; KIMCO REALTY
CORPORATION, as a corporation and
as successor-in-interest to Pan
Pacific Retail Properties, Inc.;
PRUDENTIAL REAL ESTATE
INVESTORS, as a corporation and as
successor-in-interest to Pan Pacific
Retail Properties, Inc.; JOHN A.
BRANAGH, individually and as a
partner of Modesto Center
Investors, LP and MC II, LP;
LYNETTE F. BRANAGH, individually
and as a partner of Modesto
Center Investors, LP and MC II,
LP; GAYLON C. PATTERSON,
individually and as a partner of

18245

Modesto Center Investors, LP and
MC II, LP; MARLA J. PATTERSON,
individually and as a partner of
Modesto Center Investors, LP and
MC II, LP; MODESTO CENTER
INVESTORS, LP; MC II, LP;
VULCAN MATERIALS COMPANY;
LEGACY VULCAN CORPORATION;
MULTIMATIC CORPORATION, now
known as Kirrberg Corporation;
MULTIMATIC, LLC; THE KIRRBERG
CORPORATION, FKA Multimatic
Corporation; THE DOW CHEMICAL
COMPANY; R.R. STREET & CO. INC.,
            *Defendants-Appellees,*

                    v.

CITY OF MODESTO,
            *Third-party-defendant.*

No. 10-16916

D.C. No.
1:08-cv-00872-LJO-
SMS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
May 13, 2011—San Francisco, California

Filed July 26, 2011
Amended September 26, 2011

Before: Diarmuid F. O'Scannlain and Ronald M. Gould,
Circuit Judges, and Amy J. St. Eve, District Judge.*

Opinion by Judge O'Scannlain;
Concurrence by Judge St. Eve

---

*The Honorable Amy J. St. Eve, United States District Judge for the
Northern District of Illinois, sitting by designation.

**COUNSEL**

Jan A. Greben, Greben & Associates, Santa Barbara, California, argued the cause and filed the briefs for the plaintiff-appellant. With him on the briefs were Jeff G. Coyner and Danielle L. De Smeth, Greben & Associates, Santa Barbara, California.

Eric Grant, Hicks Thomas LLP, Sacramento, California, argued the cause and filed a brief for the defendant-appellee. With him on the brief was John B. Thomas, Hicks Thomas LLP, Houston, Texas.

**ORDER**

The opinion filed July 26, 2011, slip op. 9559 is amended as follows:

1.  At slip op. page 9560, line 14 and 9565, line 12, replace "R.R. Street & Co., Inc." with "R.R. Street & Co. Inc."

2.  At slip op. page 9573, lines 23-25, replace "in McHenry, California" with "on McHenry Avenue" and "Modesto" with "Orangeburg Avenue."

An amended opinion is filed concurrently with this order.

The panel has voted to deny the petition for rehearing with suggestion for rehearing en banc. The panel has unanimously voted to deny the petition for rehearing. Judges O'Scannlain and Gould have voted to deny the suggestion for rehearing en banc, and Judge St. Eve has so recommended. The full court has been advised of the suggestion for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the suggestion for rehearing en banc are DENIED. No further petitions for rehearing will be entertained.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide, among other things, whether the manufacturer of a machine used in the dry cleaning process may be held liable for contribution to environmental cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act.

### I

Plaintiff-Appellant Team Enterprises, LLC ("Team") has, since 1980, leased space in a shopping center in Modesto, California, where it operates a dry cleaning store. From 1980 to 2004, Team used perchlorethylene ("PCE"), a volatile organic compound defined as a "hazardous substance" by the State of California, in its dry cleaning operation. Team's dry cleaning machines used PCE as part of the cleaning process, thereby generating wastewater containing the chemical. Team used Puritan Rescue 800 filter-and-still combination equip-

ment ("Rescue 800"), designed and manufactured by Defendant-Appellee R.R. Street & Co., Inc. ("Street"), to filter and to recycle the PCE-laden wastewater for reuse. The Rescue 800 returned distilled PCE to Team's dry cleaning machines and deposited the resulting wastewater into an open bucket. Once in the bucket, some of the remaining PCE would separate from the water, allowing Team to recapture "pure" (or visible amounts of) PCE for reuse. The remaining wastewater contained dissolved—and invisible—PCE.

Team disposed of this wastewater by pouring it down the sewer drain. Some of the PCE then leaked into the soil, and the California Regional Water Quality Control Board deemed the affected property in need of cleanup, which Team duly performed at its own expense.

Team sued Street and several other defendants in the Eastern District of California,[1] for contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. Team also alleged various state-law causes of action, including claims for trespass and nuisance.

The district court granted summary judgment to Street on all claims and entered final judgment as to it. Team timely appealed the district court's grant of summary judgment as to Team's CERCLA, trespass, and nuisance claims.

## II

### A

**[1]** Congress enacted CERCLA in 1980 "in response to the

---

[1]In a memorandum disposition filed concurrently with this opinion, we decide Team's appeal from the district court's grant of judgment on the pleadings to Multimatic Corporation. *See Team Enters., LLC v. Multimatic Corp.*, No. 10-16486.

serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1874 (2009). CERCLA was "designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (internal quotation marks and citation omitted). The statute imposes strict liability for environmental contamination upon four broad classes of covered persons.[2] 42 U.S.C. § 9607(a).

**[2]** Once identified as a covered person, "an entity . . . may be compelled to clean up a contaminated area or reimburse the Government for past and future response costs." *Burlington N.*, 129 S. Ct. at 1878; *see also* 42 U.S.C. § 9607(a)(4)(A)-(D) (describing the remediation and cleanup costs for which covered persons may be held liable). CERCLA further provides that a person who has incurred cleanup costs may seek contribution from any other covered person. 42 U.S.C. § 9613(f)(1). Team argues that Street is a covered person because Street allegedly "arranged for disposal" of hazardous substances. The section giving rise to arranger liability provides, in relevant part, that liability shall be imposed on:

> any person who by contract, agreement or otherwise arranged for disposal . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances . . . .

---

[2]These categories include: (1) the current owners and operators of a vessel or facility, (2) the former owners or operators of a facility at the time of disposal of any hazardous substance, (3) any persons who arranged for disposal or treatment of a hazardous substance at any facility owned or operated by another party, and (4) transporters of such substances to a disposal or treatment facility. 42 U.S.C. § 9607(a).

42 U.S.C. § 9607(a)(3). Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal. *See Burlington N.*, 129 S. Ct. at 1878 ("[Arranger] liability would attach . . . if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance."). Because there are myriad schemes by which a party may "arrange[ ] for disposal" of a hazardous substance, courts have recognized that determining whether a transaction gives rise to arranger liability is a fact-intensive inquiry. *See Cal. Dep't of Toxic Substances v. Alco Pac., Inc.*, 508 F.3d 930, 938 (9th Cir. 2007).

B

Team alleges that Street is subject to arranger liability under two distinct theories: (1) Street took "intentional steps" and "planned a disposal" of PCE, and (2) Street had "authority to control and exercised control over the disposal process."

1

**[3]** In *Burlington Northern*, the Supreme Court recognized that "CERCLA does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance." 129 S. Ct. at 1879. Nevertheless, giving the phrase its "ordinary meaning," the Court explained that "the word 'arrange' implies action directed to a specific purpose." *Id.* (citing Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1993)). Therefore, "an entity may qualify as an arranger . . . when it takes intentional steps to dispose of a hazardous substance." *Id.* While actions taken with the *intent* to dispose of a hazardous substance are sufficient for arranger liability, actions taken with the mere *knowledge* of such future disposal are not. *See id.* at 1880. As the Court explained,

> [w]hile it is true that in some instances an entity's knowledge that its product will be . . . discarded may

provide evidence of the entity's intent to dispose of its hazardous wastes, *knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.*

*Id.* (emphasis added).

**[4]** In light of the intent requirement, we have long recognized the so-called useful product defense to CERCLA claims. *See Alco Pac.*, 508 F.3d at 934. The defense prevents a seller of a useful product from being subject to arranger liability, even when the product itself is a hazardous substance that requires future disposal. *Id.* In other words, a person may be subject to arranger liability "only if the material in question constitutes 'waste' rather than a useful product."[3] *Id.* (citation omitted). A plaintiff can overcome the defense by showing that the substance involved in the transaction "has the characteristic of waste at the time it is delivered to another party." *Id.* at 936 (internal quotation marks and citation omitted).

The useful product doctrine serves as a convenient proxy for the intent element because of the general presumption that persons selling useful products do so for legitimate business purposes. It would be odd, for example, to say that an auto parts store sells motor oil to car owners *for the purpose* of disposing of hazardous waste. Conversely, persons selling or otherwise arranging for the transfer of hazardous waste

---

[3]CERCLA does not define the term "disposal" but instead incorporates the definition set forth in the Solid Waste Disposal Act ("SWDA"). *See* 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge . . . of any . . . hazardous waste into or on any land or water so that such . . . hazardous waste . . . may enter the environment . . . ." *Id.* § 6903(3). Because the term disposal specifically incorporates the concept of "waste," this court has "developed a body of case law distinguishing between the disposal . . . of 'waste' and the sale of a 'useful product.' " *Alco Pac.*, 508 F.3d at 934.

(which no longer serves any useful purpose) are more likely trying to avoid incurring liability that might attach were they to dispose of the hazardous waste themselves. In other words, the probable *purpose* for entering into such a transaction is to dispose of hazardous waste.

### a

**[5]** We recognize that the prototypical case applying the useful product doctrine to avoid liability involves a defendant selling products that qualify as hazardous substances, such as pesticides or batteries. *See, e.g.*, *Burlington N.*, 129 S. Ct. at 1870 (sale of pesticides); *Alco Pac.*, 508 F.3d 930 (sale of dross and slag); *La.-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565 (9th Cir. 1994) (sale of slag); *Catellus Dev. Corp. v. United States*, 34 F.3d 748 (9th Cir. 1994) (sale of spent batteries). Conversely, none of the parties in this appeal contend that the Rescue 800 equipment is itself a hazardous substance. Nevertheless, the presumption animating the doctrine—that people sell useful products for legitimate business purposes, not for the purpose of disposing of waste—is applicable to this case. Absent a showing that Street intended for its sale of the Rescue 800 to result in the disposal of PCE, we must conclude that Street lacks the requisite intent for arranger liability. *See Burlington N.*, 129 S. Ct. at 1879 (" '[I]t would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has otherwise arranged for disposal . . . of hazardous substances.' " (quoting *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996))).

### b

**[6]** Team insists that intent can be inferred from Street's designing its product in such a way as to render disposal inevitable. According to Team, the Rescue 800 generated wastewater containing dissolved PCE, and Team allegedly had "no other choice than to dispose of the contaminated waste water"

by pouring it down the drain. But the design of the Rescue 800 does not indicate that Street *intended* the disposal of PCE. At most, the design indicates that Street was indifferent to the possibility that Team would pour PCE down the drain. This is insufficient. *See id.* at 1880 (rejecting the Government's argument that Shell could be held liable as an arranger "by shipping [the pesticide] . . . under conditions it knew would result in the spilling of a portion of the hazardous substance").

**[7]** Team has presented no evidence indicating that Street designed the Rescue 800 for the alleged "purpose of being a waste disposal machine." The self-evident purpose of the Rescue 800 was to recover and to recycle usable PCE that would otherwise be discarded. Indeed, if Team's assertions are true, Team would have disposed of far more PCE had it *not* used the Rescue 800 to recapture used PCE. That Team felt compelled to dispose of wastewater containing PCE after using the Rescue 800 does not indicate that Street "planned a disposal" of PCE. We are therefore satisfied that Street is not subject to arranger liability on the basis of its product design.

c

**[8]** Team also urges us to infer intent from Street's failure to warn Team about the risk of contamination that would result from improper disposal. But allowing intent to be inferred from a mere failure to warn would greatly expand the scope of arranger liability. For example, a plaintiff would have a viable CERCLA claim against an auto manufacturer that failed to warn purchasers that motor oil must be disposed of properly once it has outlived its usefulness. Countless other manufacturers would also be subject to arranger liability under Team's novel theory. We are unpersuaded that CERCLA liability extends so far. While a manufacturer who fails to warn the buyer about a product's inherent risk might be subject to a products-liability claim, we are not convinced that sellers of useful products must instruct buyers on proper disposal techniques in order to avoid CERCLA liability.

**[9]** In conclusion, we hold that to satisfy the intent requirement, a company selling a product that uses and/or generates a hazardous substance as part of its operation may not be held liable as an arranger under CERCLA unless the plaintiff proves that the company entered into the relevant transaction with *the specific purpose* of disposing of a hazardous substance. Team has failed to present evidence giving rise to a triable issue as to whether Street sold the Rescue 800 with such a purpose.

2

**[10]** Team also asserts that Street "exercised control over the disposal process." Arranger liability premised upon a party's control over the disposal process is well established. *See United States v. Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir. 2002) ("[C]ontrol is a crucial element of the determination of whether a party is an arranger under § 9607(a)(3)"). In *Shell Oil*, we explained that " '[n]o court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue.' " *Id.* at 1058 (quoting *United States v. Iron Mountain Mines, Inc.*, 881 F. Supp. 1432, 1451 (E.D. Cal. 1995)); *see also Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992) ("[I]t is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision."). Given that Street had no legal authority to direct Team's conduct, Team must show that Street exercised actual control over Team's disposal of PCE to subject Street to arranger liability.

a

Here, Street never owned or possessed the hazardous substances at issue. Nor did Street have a duty to dispose of the

PCE Team used in its dry cleaning machines. Nevertheless, Team claims that because the design of the Rescue 800 "required a dry cleaner to toss contaminated waste water down the drain," Street controlled the disposal of PCE. This argument is unavailing in light of *Burlington Northern*. There, Shell's requirement that the purchaser store the pesticide in bulk required the purchaser to transfer the chemical from one bulk tank to another using a process that invariably led to disposal of the hazardous substance. *Burlington N.*, 129 S. Ct. at 1875. The Court held, however, that Shell was not liable as an arranger under such circumstances. *Id.* at 1880.

b

**[11]** Team also points to a portion of the Rescue 800's instruction manual that directed users to pour wastewater into a bucket. This is insufficient to establish control because instruction manuals are akin to recommendations and, therefore, do not control the actions of the purchaser. *See Cal. Dep't of Toxic Substances Control v. Payless Cleaners*, 368 F. Supp. 2d 1069, 1080 (E.D. Cal. 2005) (concluding that instruction manuals do not "exercise [ ] control over the ultimate decision on how to dispose of the PCE"). Even if the evidence established that Team was compelled to follow every step in the instruction manual, the manual directed Team to attach a "pipe from waste water leg of water separator downward 18 [inches] so that waste water may be caught in a pail or other suitable container." This procedure was implemented to ensure that "solvent will not be lost down the drain." Team's vice president of operations in Modesto, Frederic Jones, Jr., confirmed in his deposition that "one purpose of the bucket was to prevent pure [PCE] from going down the drain in the event of a separator malfunction." Team presented no evidence that Street controlled its subsequent act of pouring the contents of the pail down the drain. Team claims that other disposal options were cost prohibitive, and that it therefore had "no practical choice as to how to dispose of the waste water." Nevertheless, without evidence that Street exer-

cised *actual control* over Team's disposal, the options (or lack thereof) available to Team are irrelevant for purposes of arranger liability.

c

Team next argues that Street's "employees dumped PCE down the drain in Team's stores," when they visited the stores to take titration samples. The only reference in the record to such activity, however, comes from Jones's deposition. When Street's counsel asked Jones where he recalled seeing Street employees dumping wastewater down the drain, Jones answered, "McHenry," referring to a store on McHenry Avenue. Jones's own testimony fails to establish that any Street employee dumped PCE down the drain at the Orangeburg Avenue store at issue in this case.[4]

The other pieces of evidence offered by Team in its opposition to Street's motion for summary judgment similarly fail to establish that Street exercised any actual control over Team's disposal of PCE. The deposition of Street's vice president, Vincent Romanco, establishes only that Street's manual instructed Team to dispose of the wastewater into a bucket and that Street did not tell Team what to do with the contents of the bucket. And the internal memorandum authored by Manfred Wentz, Street's Vice President for Research and Development and Environmental Affairs, establishes only that Street knew that many dry cleaners disposed of PCE-laden wastewater by pouring it down the drain.

**[12]** Team does not point to any evidence in the record that Street hooked up the Rescue 800 to the sewer, that Street con-

---

[4]We do not decide whether a party could ever be held liable as an arranger on the ground that its employees disposed of small samples of a hazardous substance once every month or so. But even if we were to accept such a theory of liability, the evidence in the record fails to create a genuine dispute as to any material fact with respect to this claim.

tinued to own the Rescue 800 used in Team's store, that Street owned or possessed the PCE that Team disposed of, that Street made dumping wastewater down the drain a condition of its sales contract with Team, or that Street employees poured wastewater down the drain at Team's stores. In short, there is a dearth of evidence indicating that Street exercised actual control over Team's disposal.

## C

**[13]** Accordingly, we conclude that Team has not presented evidence giving rise to a genuine dispute as to any material fact with respect to its CERCLA claim.

## III

**[14]** Team also argues that the district court erred by granting summary judgment to Street on Team's nuisance claim. California defines a "nuisance" as "[a]nything which is injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. Chemical contamination of the soil that affects, or threatens to affect, water quality constitutes a nuisance. *Selma Pressure Treating Co. v. Osmose Wood Preserving Co. of Am., Inc.*, 271 Cal. Rptr. 596, 607 (Ct. App. 1990), *overruled on other grounds by Johnson v. Am. Standard, Inc.*, 179 P.3d 905, 913-14 (Cal. 2008). A person may be held liable under nuisance law if he " 'creat[es] or assist[s] to create and maintain the nuisance.' " *Id.* (quoting *Hardin v. Sin Claire*, 47 P. 363, 364 (Cal. 1896)); *see also City of Modesto Redev. Agency v. Superior Court*, 13 Cal. Rptr. 3d 865, 872 (Ct. App. 2004) ("[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance.").

**[15]** Here, it is undisputed that chemical contamination of the soil, which is "injurious to health," Cal. Civ. Code § 3479, has occurred. The viability of Team's claim therefore depends on whether Street "creat[ed] or assist[ed] to create and maintain the nuisance." *Selma Pressure Treating*, 271 Cal. Rptr. at 607. A defendant may be liable for assisting in the creation of a nuisance if he either (1) affirmatively instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner, *see City of Modesto*, 13 Cal. Rptr. 3d at 874-75, or (2) manufactures or installs the disposal system, *see Selma Pressure Treating*, 271 Cal. Rptr. at 607. Mere but-for causation, on the other hand, does not give rise to nuisance liability. *See Redevelopment Agency of the City of Stockton v. BNSF Ry. Co.*, No. 09-16585, ___ F.3d ___ (9th Cir. 2011) (holding that a railroad could not be held liable for nuisance that resulted when pollution traveled through a french drain installed by the railroad because the drain was "designed to move water, not contaminants").

**[16]** Although Team presented evidence that Street instructed it to pour wastewater containing PCE into a bucket, there is no evidence in the record that Street "instructed the dry cleaners to set up their equipment to discharge solvent-containing wastewater into the drains and sewers," or that Street "gave dry cleaners instructions to dispose of spilled [PCE] on or in the ground." *City of Modesto*, 271 Cal. Rptr. 3d at 874. And despite Team's protestations that once wastewater from the Rescue 800 had been poured into a bucket there was no alternative but to pour it down the drain, Team's alleged lack of alternatives do not indicate that Street engaged in the "kinds of affirmative acts or instructions" that would "support a finding that [Street] assisted in creating a nuisance." *Id.*

**[17]** Moreover, it is clear from the record that the Rescue 800 is not a disposal system. The Rescue 800 was not designed to route wastewater from the dry cleaning machines to the sewer; it was designed to filter and to recycle used PCE

that otherwise would have been lost. We therefore agree with the district court's conclusion that Team failed to present evidence giving rise to a genuine dispute as to any material fact with respect to its nuisance claim.

IV

**[18]** Finally, Team argues that the district court erred by granting summary judgment to Street on Team's trespass claim. A trespass is "an invasion of the interest in the exclusive possession of land." *Capogeannis v. Superior Court*, 15 Cal. Rptr. 2d 796, 799 (Ct. App. 1993) (citation and internal quotation marks omitted). "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." *Martin Marietta Corp. v. Ins. Co. of N. Am.*, 47 Cal. Rptr. 2d 670, 681 (Ct. App. 1995) (citation and internal quotation marks omitted). In California, "it is established that trespass . . . may include . . . invasion by pollutants." *Id.* at 682.

**[19]** Even though the action causing the entry of pollutants does not have to be intentional, the entry must be "unauthorized" to support a cause of action for trespass. *Id.* at 681; *see also Cnty. of Santa Clara v. Atl. Richfield Co.*, 40 Cal. Rptr. 3d 313, 333 (Ct. App. 2006) ("Where the owner of property voluntarily places a product on the property and the product turns out to be hazardous, the owner cannot prosecute a trespass cause of action against the manufacturer of that product because the owner has consented to the entry of the product onto the land."). Team, however, did not present any evidence that either the Rescue 800 or the PCE entered the property without Team's consent. Moreover, Team's employees contaminated the soil by pouring the wastewater down the drain, and "one cannot commit an actionable interference with one's own possessory right." *Capogeannis*, 15 Cal. Rptr. 2d at 799. Because Team's contamination of the land was not a trespass

against itself, Street may not be held liable for assisting in a trespass.[5]

We therefore conclude that Team has failed to present evidence creating a genuine dispute as to any material fact with respect to its trespass claim.

V

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

ST. EVE, District Judge, specially concurring:

I am pleased to join the majority's well-reasoned and insightful opinion. I write separately to explain my view that CERCLA, by its plain language, should not apply to this case.

The Supreme Court has explained that courts are to consider "the plain language of [CERCLA]" and to give undefined terms in the statute their "ordinary meaning." *Burlington N.*, 129 S. Ct. at 1879. The arranger-liability provision of the Act covers "any person who by contract, agreement or otherwise arranged for disposal or treatment . . . of hazardous substances *owned or possessed by such person*, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous sub-

---

[5]Team's reliance on *Newhall Land & Farming Co. v. Superior Ct.*, 23 Cal. Rptr. 2d 377 (Ct. App. 1993), is misplaced. In *Newhall*, the court held that the plaintiff had stated a claim for trespass under a "continuing trespass theory." *Id.* at 383 ("A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it." (citation and internal quotation marks omitted)). Such a theory has no relevance to this case because Street did not tortiously place the Rescue 800 or the PCE on Team's property.

stances." 42 U.S.C. § 9607(a)(3) (emphasis added). To be liable under this provision, therefore, an arranger must have owned or possessed the "hazardous substance."

The plain language of the statute indicates that a liable "arranger" must own or possess the hazardous substance. Although Ninth Circuit precedent forecloses this interpretation for the purpose of the present case, *see Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1079-82 (9th Cir. 2006), I am convinced that the better construction of the arranger-liability provision of CERCLA is as I have indicated. In this case, the undisputed evidence reveals that Street did not, at any point, own or possess the relevant PCE. Accordingly, Street is entitled to summary judgment on Appellant's CERCLA claim.